Duncan McCOY, Alex Dorsett, and Alex–Duncan Shrimp Chef, Inc.,
Plaintiffs–Appellees,

v.

MITSUBOSHI CUTLERY, INC., and Admiral Craft Equipment Corporation,
Defendants–Appellants.

No. 95–1087.

United States Court of Appeals,
Federal Circuit.

Oct. 4, 1995.

Rehearing Denied Oct. 30, 1995.

George M. Bishop, George M. Bishop and Associates, Houston, Texas, argued for plaintiffs-appellees. Of counsel were Guy C. Mat-

thews and J. Albert Riddle, Matthews and Associates, Houston, Texas.

William W. Goodrich, Jr., Arent, Fox, Kintner, Plotkin and Kahn, Washington, DC, argued for defendants-appellants. With him on the brief were Jennifer A. Albert and Marilyn T. Dare.

Before MAYER, MICHEL, and RADER, Circuit Judges.

RADER, Circuit Judge.

Duncan McCoy, Alex Dorsett, and Alex–Duncan Shrimp Chef, Inc. (McCoy) sued Mitsuboshi Cutlery, Inc. (Mitsuboshi) and Admiral Craft Equipment Corp. (Admiral Craft) for infringing McCoy's intellectual property rights and committing business torts. McCoy's sales organization had hired Mitsuboshi to make and supply shrimp knives covered by McCoy's patent and trademarks. When Mitsuboshi produced the knives, McCoy refused to pay for them. Mitsuboshi resold the knives to Admiral Craft. McCoy sought damages from Mitsuboshi and Admiral Craft for selling the knives to third parties. Admiral Craft settled with McCoy before trial.

A jury found that Mitsuboshi committed patent and trademark infringement in violation of federal law, tortious interference with McCoy's prospective business relations in violation of Texas law, and unfair competition in violation of federal and Texas law. The jury also found, however, that McCoy breached its contract with Mitsuboshi by refusing to pay for the knives. The trial court then entered judgment awarding McCoy $2.6 million in actual and punitive damages, attorney fees, and costs, plus prejudgment interest. *McCoy v. Mitsuboshi Cutlery, Inc.*, No. H–93–1774 (S.D.Tex. Sept. 19, 1994) (final judgment). The trial court also awarded Mitsuboshi $89,337 on its breach of contract counterclaim. *Id.* Because Mitsuboshi was entitled to resell the knives in response to McCoy's wrongful refusal to pay, this court reverses.

## BACKGROUND

McCoy owns U.S. Patent No. 4,759,126 on a shrimp knife that peels, deveins, and but-terflies in one motion. McCoy arranged for Mitsuboshi, a Japanese knife manufacturer, to produce shrimp knives embodying the patented invention. At McCoy's request, Mitsuboshi stamped the knives with McCoy's registered U.S. Trademarks Nos. 1,687,589 and 1,702,878. From 1988 to 1990, Mitsuboshi manufactured and sold large quantities of these knives to McCoy.

In 1991, McCoy's separate marketing organization, A.T.D. Marketing, Inc. (ATD), ordered 150,000 of the knives from Mitsuboshi. Mitsuboshi produced the knives. When Mitsuboshi timely offered the knives, ATD refused to accept or pay for them. ATD's refusal left Mitsuboshi holding the 150,000 knives in its warehouse in Japan. The record contains no suggestion that the knives were defective.

McCoy acknowledged its responsibility for ATD's refusal to pay. McCoy, however, accepted and paid for only about 20,000 of the 150,000 knives ordered. McCoy refused to pay for the other 130,000 knives. On the basis of these facts, the jury found that McCoy breached its contract with Mitsuboshi. McCoy did not appeal this jury verdict.

Following McCoy's partial payment, Mitsuboshi continued to negotiate for payment and delivery of the remaining 130,000 knives. McCoy, however, remained silent, unable to pay for them. In the face of this silence, Mitsuboshi repeatedly notified McCoy of its intent to resell the knives to mitigate damages. At length, Mitsuboshi sold 6,456 of the knives to Admiral Craft, a mail-order wholesaler of restaurant supplies. Admiral Craft sold 958 of the knives in the United States to restaurants and supply houses in 1993 through its mail catalog.

McCoy sued Mitsuboshi and Admiral Craft for patent and trademark infringement, unfair competition in violation of both federal and Texas law, and several Texas state law torts. Admiral Craft settled, but Mitsuboshi persevered, counterclaiming for breach of contract. At the close of evidence, Mitsuboshi moved for judgment as a matter of law that it was entitled to resell the knives. The trial court denied Mitsuboshi's motion. The jury found against Mitsuboshi on the in-

fringement, unfair competition, and tortious interference counts, and for Mitsuboshi on the breach of contract count. Mitsuboshi then renewed its motion for judgment as a matter of law. The trial court again denied the motion. Mitsuboshi appeals.

## DISCUSSION

### I.

The jury found, and McCoy does not contest, that McCoy breached its contract with Mitsuboshi. This appeal thus raises the purely legal question of the effect of McCoy's breach on his intellectual property rights in the knives. This court confronts this question for the first time.

 A patent confers on its holder the right to exclude others from making, using, or selling what is described in its claims. 35 U.S.C.A. § 154(a)(1) (West Supp.1995); *see generally Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547, 35 USPQ2d 1065, 1070 (Fed. Cir.1995) (en banc). This court has recognized that these intellectual property rights, like any other property rights, are subject to the contractual obligations of their owner and the applicable law:

> Th[e] right to exclude may be waived in whole or in part. The conditions of such waiver are subject to patent, contract, antitrust, and any other applicable law, as well as equitable considerations such as are reflected in the law of patent misuse. *As in other areas of commerce, private parties may contract as they choose, provided that no law is violated thereby* . . . .

*Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 703, 24 USPQ2d 1173, 1176 (Fed. Cir.1992) (emphasis added). Thus, a patent or trademark owner may contract to confer a license on another party. *See id.* (patent); *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 489, 22 USPQ2d 1773, 1774–75 (5th Cir. 1992) (trademark).[1] In most instances under contract law, a patent or trademark owner intentionally creates an express license. A

licensee, of course, has an affirmative defense to a claim of patent infringement.

 In some circumstances, however, the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license. *See Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1559, 219 USPQ 377, 383 (Fed.Cir.1983). The Supreme Court stated:

> Any language used by the owner of the patent or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action . . . .

*De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1927). When warranted by such a course of conduct, the law implies a license. *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062, 1068, 3 USPQ2d 1288, 1293–94 (Fed. Cir.1987).

 Whether express or implied, a license is a contract "governed by ordinary principles of state contract law." *Power Lift, Inc. v. Weatherford Nipple–Up Sys., Inc.*, 871 F.2d 1082, 1085, 10 USPQ2d 1464, 1466 (Fed.Cir.1989). Moreover the law may imply licenses "to make effective the contracts of the patentee." 6 Ernest B. Lipscomb, III, *Libscomb's Walker on Patents* § 20:14, at 33 (3d ed. 1987). An implied license, however, must not exceed the limits necessary to make the contract effective. *See Waterman v. Mackenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891).

 To enforce the contracts of the patentee, the law may imply a license where a patent holder sells or authorizes the sale of a patented product—a voluntary sale. *See, e.g., United States v. Univis Lens Co.*, 316 U.S. 241, 250–51, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408, 53 USPQ 404, 408 (1942); *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872, 880, 169 USPQ 759, 763–64 (2d Cir.1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666,

---

1. This court applies regional circuit law—here, the law of the Fifth Circuit—to trademark and unfair competition issues that are not unique to this court's exclusive jurisdiction. *See, e.g., Ima-*

*gineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1263, 34 USPQ2d 1526, 1528 (Fed.Cir.), *cert. den.*, —— U.S. ——, 116 S.Ct. 277, —— L.Ed.2d —— (1995) (No. 95–127).

172 USPQ 257 (1972). Thus, "an authorized sale of a patented product places that product beyond the reach of the patent." *Intel Corp. v. ULSI Sys. Technology, Inc.,* 995 F.2d 1566, 1568, 27 USPQ2d 1136, 1138 (Fed. Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994). Under this implied license, a patent holder receives a reward for inventive work in the first sale of the patented product. *Univis,* 316 U.S. at 251, 62 S.Ct. at 1093. As the Supreme Court stated:

> Patentees ... are entitled to but one royalty for the patented machine, and consequently when a patentee has himself constructed the machine and sold it, or authorized another to construct and sell it, or to construct and use and operate it, and the consideration has been paid to him for the right, he has then to that extent parted with his monopoly, and ceased to have any interest whatever in the machine so sold or so authorized to be constructed and operated.

*Bloomer v. Millinger,* 68 U.S. (1 Wall.) 340, 350, 17 L.Ed. 581 (1863).

In some cases, the law implies a license where a patent holder does not authorize the sale of a patented product—an involuntary sale. *See, e.g., Wilder v. Kent,* 15 F. 217, 219 (C.C.W.D.Pa.1883). For example, in *Wilder,* the patent holder sued an individual for infringement who purchased a machine at a sheriff's sale. The court dismissed the complaint finding the purchaser had acquired the right to use the patented machine through the purchase at the sheriff's sale. The court reasoned: "To deny to the sheriff's vendee the right to use such machine would in effect prevent its sale upon an execution at law ... and practically withdraw it from the reach of the owner's execution creditors." *Id.* While appreciating the unique nature of patent rights, the court noted that "a patented machine is susceptible of manual seizure, and the unrestricted sale thereof does not involve the transfer of any interest in the patent." *Id.* at 220.

Justice Story, sitting on the Massachusetts Circuit Court, recognized a similar principle in denying a patent holder the right to sue a sheriff for infringement for his part in the sale of a patented product at a sheriff's sale. *Sawin v. Guild,* 21 F.Cas. 554, 554–55 (C.C.D.Mass.1813) (No. 12,391). He reasoned that statutes must be construed where possible to avoid introducing "public mischiefs, or manifest incongruities." *Id.* Justice Story felt a great public mischief would result if courts construed the patent laws to permit an action against a sheriff for selling a patented product at a sheriff's sale. *Id.*

More recently, in an opinion authored by Judge Friendly, the United States Court of Appeals for the Second Circuit expressly recognized and extended this implied license doctrine to the sale of products by an aggrieved seller to remedy a buyer's breach. *Platt & Munk Co. v. Republic Graphics, Inc.,* 315 F.2d 847, 137 USPQ 268 (2d Cir.1963). Platt & Munk owned copyrights on educational toys and contracted with Republic to supply them. *Id.* at 849. After Republic began delivery, Platt & Munk alleged various defects and refused to pay for the balance of the toys. *Id.* at 849–50. Republic then informed Platt & Munk of its intent to resell the toys to recover its production costs. Platt & Munk responded by seeking an injunction prohibiting Republic from reselling the toys without Platt & Munk's consent. *Id.* at 850. The trial court granted a preliminary injunction without addressing whether the toys were actually defective or whether Platt & Munk had the right to refuse payment. Republic filed an interlocutory appeal. *Id.*

The Second Circuit remanded to the trial court to determine whether Platt & Munk justifiably refused to pay for the toys. *Id.* at 855. If not, it instructed the trial court to lift the injunction. In other words, if Platt & Munk breached the contract, Republic had a right to resell the toys notwithstanding any copyright protection. *Id.* The Second Circuit based its holding on New York contract law, which provided a seller of goods the right to mitigate damages for contract breaches. *Id.* at 854. Where Platt & Munk breached, the Second Circuit found that Platt & Munk's copyrights had no effect on Republic's state law right to resell:

> We see no reason why the copyrighted character of the goods should preclude [re-

sale] when—and the qualification is vital—the person for whom the goods were being made unjustifiably refuses to pay the price. *Platt*, 315 F.2d at 855.

■ This ruling extended the implied license doctrine beyond sales under judicial decree to sales under self-help provisions in commercial law. Together, *Wilder, Sawin*, and *Platt* demonstrate that the law may create an implied license to enforce the contract obligations of the patent holder and recognize legal rights of aggrieved parties. In the case of the sheriff's sale, the patent holder defaulted on an obligation collateralized by patented merchandise. The creditor can have the property seized by the sheriff and sold. In the case of the self-help sale, the patent holder has defaulted on a contractual obligation based on patented merchandise. Under commercial law, the aggrieved seller can sell the merchandise and recover any losses from the breaching buyer. Absent an implied license in either case, patent holders could frustrate otherwise available commercial remedies.

■ Here, McCoy and Mitsuboshi had a long-standing business relationship whereby Mitsuboshi manufactured McCoy's patented knives. In 1991, McCoy placed a purchase order for 150,000 knives with Mitsuboshi. Mitsuboshi, in turn, accepted the order and performed its obligations under that agreement. When it tendered the knives to McCoy, McCoy breached the contract by failing to pay. At that point, rather than immediately act, Mitsuboshi continued to negotiate with McCoy in an effort to secure payment and deliver the knives. After repeated failed attempts, Mitsuboshi sold some of the knives to an American company.

The applicable state contract law in this case is Texas's version of the Uniform Commercial Code. Tex.Bus. & Com.Code §§ 1.101–11.108 (1995) (Texas UCC). Because this case involves the sale of goods, the Texas UCC entitles the seller to resell the goods upon the buyer's wrongful refusal to pay. Texas UCC §§ 2.703(4), 2.706(a). Consequently, under Texas contract law, when McCoy breached the contract, Mitsuboshi had a right to resell the knives to recoup its losses without McCoy's consent.

■ As in *Platt*, an implied license properly enforces McCoy's contractual promise to pay for the knives, reflects Mitsuboshi's commercial efforts to resolve the matter, and recognizes Mitsuboshi's rights to mitigate under the Texas UCC. This court, like our sister circuit in *Platt*, sees no reason why the owner of intellectual property rights deserves to evade application of the ordinary contract remedy of resale for an unjustified refusal to pay.

This implied license does not offend the protection afforded patent and trademark rights by federal law. Instead, licenses, like other federal property and contract rights, conform to the applicable state laws. *See Power Lift*, 871 F.2d at 1085; *see also Mallinckrodt*, 976 F.2d at 703. As this court observed in *Power Lift*, the Supreme Court has held that federal patent law does not preempt enforcement of contracts under state law. *Id.* (discussing *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 261–64, 99 S.Ct. 1096, 1098–1100, 59 L.Ed.2d 296, 201 USPQ 1, 4–6 (1979)). By the same reasoning, federal trademark law does not preempt contract enforcement either. Intellectual property owners "may contract as they choose," *Mallinckrodt*, 976 F.2d at 703, but their intellectual property rights do not entitle them to escape the consequences of dishonoring state contractual obligations.

Mitsuboshi's right to resell under Texas law, furthermore, did not require a prior adjudication that McCoy acted wrongfully in refusing to pay for the knives. Section 2.706(a) of the Texas UCC authorizes a seller to resell without adjudication:

Under the conditions stated in Section 2.703 on seller's remedies [that is, "[w]here the buyer wrongfully ... fails to make a payment due on or before delivery"], the seller may resell the goods concerned.... Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages ... but less expenses saved in consequence of the buyer's breach.

Section 2.706(a) explicitly authorizes a seller in Mitsuboshi's position to first resell the goods and then, if it chooses, sue to recover the difference between the resale price and the original contract price. Under the Texas UCC, therefore, Mitsuboshi had the right to resell as a self-help remedy without first obtaining judicial confirmation of McCoy's breach.

*Platt* also does not require an adjudication before resale in this case. *Platt* involved a preliminary injunction prohibiting resale. In upholding the preliminary injunction pending determination of whether Platt & Munk was obligated to pay for the goods, the Second Circuit merely recognized that the trial court had not abused its discretion in granting an injunction in light of Platt & Munk's "good faith claim that its failure to pay for the goods was justified." *Platt*, 315 F.2d at 855.

In this case, McCoy did not seek nor obtain a preliminary injunction prohibiting Mitsuboshi from reselling the knives, despite McCoy's knowledge that Mitsuboshi intended to resell. Under Texas law, nothing prevented Mitsuboshi from exercising its right to resell in response to McCoy's breach. In sum, Mitsuboshi did not infringe McCoy's patent or trademarks by exercising its Texas law right to resell the knives to mitigate the breach.

## II.

Title 15 of the U.S.Code prohibits unfair competition:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

is *likely to cause confusion, or to cause mistake, or to deceive* as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

. . . .

shall be liable in a civil action. . . .

15 U.S.C. § 1125(a)(1)(A) (1994) (emphasis added). This statute covers a wide range of unfair business practices—each, however, possessing a common thread: "[T]he touchstone of a section 1125(a) unfair competition claim is whether the defendant's actions are 'likely to cause confusion.'" *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 592, 26 USPQ2d 1532, 1536 (5th Cir.1993) (quoting section 1125(a)). Thus liability for unfair competition, like liability for trademark infringement, depends on likelihood of confusion. *Id.* at 590, 592; *see also* 15 U.S.C. § 1114(1)(a) (1994).

The United States Court of Appeals for the Fifth Circuit considers likelihood of confusion a question of fact. *Moore*, 960 F.2d at 489. In *Matrix Essentials*, however, the Fifth Circuit held as a matter of law that no likelihood of confusion can arise from the sale of genuine goods, even if the sale is unauthorized. 988 F.2d at 590–93. In *Matrix Essentials*, Emporium sold without authorization Matrix's hair-care products. Emporium, a high-volume discount drug store, acquired a supply of genuine Matrix products bearing Matrix trademarks and offered them for sale. *Id.* at 589. The products had the same origin, and thus the same quality, as other Matrix products. *Id.* at 590. Matrix, however, intended its products to be sold only in hair-cutting salons. *Id.* at 589. To protect its retail policy, Matrix bought out Emporium's entire stock. *Id.* Emporium then acquired a second supply of Matrix products. *Id.* Matrix responded by suing for trademark infringement and unfair competition. *Id.*

The Fifth Circuit rejected Matrix's claims: "Emporium's sale of Matrix products cannot cause confusion as to manufacture or sponsorship because the goods were manufactured and labeled by Matrix." *Id.* at 592. Our sister circuit observed: "the general rule is that 'trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent.'" *Id.* at 590 (quoting *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107, 18 USPQ2d 1156, 1157 (4th Cir.1991)). It is a tautology that a consumer purchasing

genuine goods receives exactly what the consumer expects to receive: genuine goods. The consumer is not confused or deceived about the source or quality of the product. *See Matrix Essentials,* 988 F.2d at 591.

■ In this case, the knives resold by Mitsuboshi were genuine. They were the same knives that Mitsuboshi would have delivered to McCoy if McCoy had not wrongfully refused to pay for them. Because the knives were genuine, *Matrix Essentials* dictates that Mitsuboshi did not cause consumer confusion by reselling them. That McCoy did not authorize resale is immaterial. Therefore, this court holds as a matter of law that Mitsuboshi did not commit trademark infringement or unfair competition by reselling the knives.

McCoy argues that Mitsuboshi confused consumers by selling McCoy goods without McCoy's approval. This argument mirrors Matrix's argument, which the Fifth Circuit rejected. In support of its unfair competition claim, Matrix argued that Emporium "[misled] consumers into believing that it is an authorized retailer of Matrix products and that Matrix condones the sale of its products through ordinary retail drugstores." *Id.* at 592. The Fifth Circuit rejected this form of confusion, if confusion at all, as actionable unfair competition:

> Matrix is not able to point to any authority holding that the unauthorized stocking of a trademark owner's products, without more, rises to the level of a "misleading representation of fact."
>
> . . . .
>
> We are not persuaded by Matrix's arguments to expand the reach of section 1125(a) to provide a cause of action merely for the unauthorized stocking and sale of a manufacturer's products. Absent more culpable conduct on the part of the seller, we are unwilling to find misrepresentation in the mere act of putting a manufacturer's product on one's shelf and offering it for sale. We therefore affirm the district court's grant of summary judgment in favor of Emporium on the trademark and unfair competition claims.

*Id.* at 593. *Matrix Essentials* thus squarely holds that the sale of genuine goods, even if unauthorized, cannot cause confusion and consequently cannot constitute trademark infringement or unfair competition. This court, as a matter of law, holds that Mitsuboshi committed no violation of the unfair competition statute.

### III.

■ The jury also found that Mitsuboshi committed tortious interference and unfair competition in violation of Texas law. Under the defense of legal justification, a party exercising its legal rights in good faith cannot tortiously interfere with another's prospective business relations. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939–40 (Tex.1991); *see also International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1270–71 (5th Cir.1991) (following *Victoria Bank & Trust* ), *cert. denied,* 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). Whether the party acted in good faith is a question of fact for the jury, *see Victoria Bank & Trust,* 811 S.W.2d at 940, which this court reviews for substantial evidence. *Genentech, Inc. v. Wellcome Found. Ltd.,* 29 F.3d 1555, 1565, 31 USPQ2d 1161, 1168–69 (Fed. Cir.1994).

In this case, however, the jury did not reach the question of good faith. In finding that Mitsuboshi committed patent and trademark infringement and unfair competition, the jury necessarily found that Mitsuboshi did not have a legal right to resell the knives. As explained, this finding is wrong as a matter of law. The law entitled Mitsuboshi to resell the knives.

■ This court need not, however, remand for a jury to determine whether Mitsuboshi acted in good faith when it resold the knives, because "nothing of record warrants a further exercise of the fact-finding function." *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1565–66, 1 USPQ2d 1593, 1595 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The record contains no evidence that Mitsuboshi acted in bad faith. Instead, the record conclusively shows Mitsuboshi's good faith. Consequently, as a matter of law, Mitsuboshi did

not tortiously interfere with McCoy's prospective business relations.

To find unfair competition under federal law, the trial court instructed the jury that McCoy could prevail on its unfair competition claim only if it proved Mitsuboshi's resale of the knives created a likelihood of confusion. As explained, this record involves no likelihood of confusion because the knives resold by Mitsuboshi were genuine. McCoy contends on appeal, however, that the jury's unfair competition verdict rests on Texas state law, which recognizes a broader range of unfair practices without proof of a likelihood of confusion. McCoy's maneuvering is to no avail.

■ In support of its state law argument, McCoy cites *Schoellkopf v. Pledger*, 778 S.W.2d 897 (Tex.Ct.App.1989), *error denied*, (June 13, 1990). *Schoellkopf* recognizes "unlawful business injury" as a type of unfair competition. *Id.* at 904.[2] *Schoellkopf* does not delineate the precise bounds of this broadly defined tort. It does, however, recognize that this type of unfair competition requires commission of another tort or other illegal conduct:

> Without some finding of an independent substantive tort or other illegal conduct, we hold that liability cannot be premised on the tort of "unfair competition."

*Id.* at 904–05. *Schoellkopf* applied this standard in a way directly relevant to the present case. A jury had awarded Pledger actual and punitive damages, finding that Schoellkopf had tortiously interfered with Pledger's contract rights and committed unfair competition. *Id.* at 899. The Texas Court of Appeals reversed the tortious interference verdict. *Id.* at 900–04. The court then reversed the unfair competition verdict, holding that Schoellkopf could not be liable for unfair competition absent tortious interference because Schoellkopf had not committed "an independent substantive tort or other illegal conduct." *Id.* at 904–05.

Likewise, Mitsuboshi has not committed an independent tort or illegal conduct justifying a finding of unfair competition under McCoy's theory on appeal. Because Mitsuboshi did not commit patent or trademark infringement, federal unfair competition, or tortious interference, no independent tort or illegality supports the verdict of unfair competition. This court also reverses that verdict.

## CONCLUSION

Texas law entitled Mitsuboshi to resell the knives upon McCoy's wrongful refusal to pay for them. The trial court erred in denying Mitsuboshi judgment as a matter of law on each of the counts in McCoy's complaint— infringement of McCoy's patent or trademarks, tortious interference with McCoy's prospective business relations, and unfair competition with McCoy by reselling the knives.

## COSTS

Each party shall bear its own costs.

*REVERSED.*

---

2. Other types of unfair competition recognized under Texas law include trade secret misappropriation, passing off, and misappropriation of business opportunity. *United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex.Ct.App.1993), *error denied*, (March 30, 1994). None of these liability theories are applicable, however. McCoy has never claimed that Mitsuboshi misappropriated its trade secrets. Before trial, furthermore, McCoy voluntarily dismissed its passing off claim, and the trial court dismissed McCoy's misappropriation of business opportunity claim.