TRAVELERS EXPRESS COMPANY, INC., Plaintiff,

v.

AMERICAN EXPRESS INTEGRATED PAYMENT SYSTEMS INC., and American Express Travel Related Services, Inc., Defendants.

No. 3–94–234.

United States District Court, D. Minnesota.

Nov. 30, 1999.

Martin R. Lueck, Sara A. Poulos, Katie Crosby Lehmann, Ann Cathcart, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, for plaintiffs.

Felicia J. Boyd, Faegre & Benson, Minneapolis, MN, James B. Lewis, Anne M. Deibert, McCutchen, Doyle, Brown & Enerson, L.L.P., San Francisco, CA, for defendant American Express Integrated Payment Systems, Inc.

William C. Rooklidge, Douglas A. Winthrop, Pauline E. Calande, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, CA, Jay W. Schlosser, Briggs & Morgan, P.A., Minneapolis, MN, for American Express Travel Related Services, Inc.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

### INTRODUCTION

This case has a long and tortured history. Plaintiff Travelers Express Company, Inc. ("Travelers") originally commenced this suit alleging patent infringement in 1994. The parties believed that they had reached a settlement agreement at the end of 1994, and as a result Defendants, believing a license was in place, continued on its business that used Travelers' patented technology. Ultimately, however, the parties were not able to agree on the terms of a definitive settlement, and this case is currently set for trial in January 2000. Currently before the Court are cross motions for partial summary judgment.

### FACTS

Travelers is a wholly-owned subsidiary of The Dial Corp ("Dial") and the largest issuer of money orders in the United States. Defendant American Express Integrated Payment System Inc. ("IPS") is a wholly-owned subsidiary of First Data Corporation ("FDC"). FDC provides high quality, high volume information processing and related services. IPS provides payment instrument transaction processing to financial institutions and to retail customers. As part of its business, IPS markets money orders, official checks, MoneyGram® money transfer service, and other products. Defendant American Express Travel Related Services, Inc. ("TRS") is a wholly-owned subsidiary of American Express Company. IPS markets American Express® Money Orders under a Management Agreement with TRS. Under the Management Agreement, although TRS is the state-licensed issuer of the American Express® Money Orders, IPS manages the business on TRS's behalf. The Management Agreement relationship was phased out April 16, 1997.

In 1989, Travelers acquired Republic Money Orders and certain AMOD patents and patent applications Republic owned. Travelers attributed approximately $13 million of its purchase price to Republic's AMOD technology. In October 1991, Travelers sued American Express Company in this Court for infringing its AMOD patents, based on the IPS machine. In April 1993, summary judgment was granted to American Express Company based on the finding that it had not infringed the Travelers' patents. Travelers then filed this suit against IPS and TRS.

By Order of this Court, designated representatives of Travelers, IPS and TRS participated in a settlement conference on December 12–14, 1994 before Special Master Sheryl Ramstad Hvass. Apart from a short initial meeting of all participants, for two days the parties remained in separate conference rooms and communicated almost exclusively through Special Master Hvass. During the day on December 13, the parties exchanged a series of term sheets proposing terms of settlement to each other. There were no direct substantive communications between the parties except through the exchange of term sheets.

Early in the morning of December 14, 1994, at about 12:30 a.m., the parties, still in their separate rooms, each signed a largely handwritten two-page agreement entitled "Settlement Term Sheet." Lewis Aff.Ex. B(1). Each side had Special Master Hvass change the Settlement Term Sheet to correct or add terms before signing it. The Settlement Term Sheet contains thirteen paragraphs, that was meant to signify the parties' general agreement as to settlement. The Settlement Term Sheet further provided that a definitive agreement was to be signed by year end, and that the terms of settlement were subject to a definitive agreement to be drafted with the assistance of the special master.

The parties exchanged drafts of proposed "definitive agreements" the following week. The parties were unable to agree to a "definitive" agreement as provided in the Settlement Term Sheet. The Court, therefore, ordered the parties to attend another settlement conference on December 30–31, 1994, before Special Master Hvass "in order to finalize and document the terms of the settlement agreed to by the parties on December 12–14." Accordingly, on December 30 and 31, 1994, the parties again met with Special Master Hvass.

By the end of this second mediation, the parties were still not able to agree as to the specific terms of the settlement. Instead, the parties entered into an agreement that provides:

> The parties agree that they reached a Settlement Agreement as of December 14, 1994. Each party will submit its position to Judge Davis as to what the terms of the Agreement are, subject to appeal. The parties further agree that they will mutually request the Court's accelerated consideration and that there be an evidentiary hearing as to what the terms of the Agreement are.

Lewis Aff.Ex. B(2) ("December 31, 1994 Agreement").

Based upon this agreement, the parties agreed to issue the following press release on January 3, 1995:

TRAVELERS EXPRESS SIGNS PATENT AGREEMENT WITH FIRST DATA BUSINESS UNIT

MINNEAPOLIS, MN—Travelers Express Corp. Inc. (TECI) today announced that Integrated Payment Systems (IPS) has entered into a licensing agreement to employ pioneering patents owned by TECI.

The licensing agreement is part of the settlement of patent infringement litigation initiated by TECI against IPS. As part of the agreement, the parties agreed to entry of a Consent Judgment acknowledging the validity and infringement of TECI's patents.

The non-exclusive patent license will be available to IPS, First Data Corporation, and their business units and products and American Express Travel Related Services Company, Inc.

IPS will pay a substantial but undisclosed amount to use TECI patents relating to money order dispenser technology, according to the parties.

TECI is a major processor of money orders, official checks for banks, share drafts for credit unions and electronic bill payments for utility companies. Its parent company, The Dial Corp., is a $3.6 billion consumer products and services company based in Phoenix.

First Data Corporation is a leading provider of high-quality, high-volume information processing and related services to the transaction card, payment instruments, teleservices, mutual fund, healthcare, receivables and information management industries.

Lewis Aff., Ex. B(4).

In January 1995, IPS tendered, and Travelers accepted, the first royalty payment in the amount of $3 million dollars as provided by the terms of the Settlement Term Sheet. Thereafter, IPS asserts it invested over $34 million in developing and

deploying a new money order dispenser, made contractual commitments to provide customers with its new automated technology, and opted to convert all of its agents to its new automated technology—the result of which is to significantly increase its infringement exposure to Travelers. Further royalty payments, as called for in the Settlement Term Sheet, were made in January 1996, 1997 and 1998.

In addition to the press release issued in January 1995, Travelers made a number of public announcements with regard to the settlement of this case. For example, in an internal newsletter, Travelers announced the settlement with IPS "that recognizes the validity of our patents and brings us compensation for the use of our patents through licensing arrangements." Lewis Aff., Ex. D(3). In August 1995, Travelers issued another press release that again mentioned the settlement with IPS and that Travelers had reached a licensing agreement with IPS. Lewis Aff., Ex. D(9). In an external newsletter issued in October 1995, Travelers told its customers that it had reached a consent judgment and a licensing agreement with IPS. Lewis Aff., Ex. D(12).

Throughout the period from January 1995 through May 1998, Travelers also repeatedly asserted to this Court that Travelers had granted IPS a license, and that the parties have performed according to Travelers' views of the scope of the license. *See*, Lewis Aff., Exs. D(15), D(16), I at Resp. to RFA 94.

An evidentiary hearing was held in March 1995 to determine if a settlement was in fact reached. The Court heard testimony from the principals involved in the settlement negotiations, and received other evidence to assist the Court in determining what the terms of settlement were, in the event the Court found an enforceable agreement had been entered into.

In the spring of 1997, when the March 1995 motion was still under advisement, the parties met with Magistrate Judge Boylan and were unable to resolve the disputed issues. In the spring of 1998, the parties again attended mediation sessions with a new Special Master, Roger Haydock, and again, were unable to settle their disputes. Travelers then moved the Court for a Rule 16 Conference and for an Order finding that the parties did not enter into an enforceable settlement agreement. The Defendants adamantly opposed the motion, arguing that the parties did settle and that an enforceable settlement agreement exists—the terms of which are stated in the Settlement Term Sheet.

This Court, by Order dated June 10, 1998, granted Traveler's motion on the basis that the parties clearly did not have a meeting of the minds as to the essential terms of its alleged settlement agreement. Thereafter, Traveler's filed an amended complaint, seeking to enjoin Defendants from infringing or continuing to infringe certain patents owned by Travelers, enjoining them from the continued manufacture, distribution, use or sale of devices that infringe the Traveler's patents and seeking an accounting of the profits and damages arising therefrom. In response to the amended complaint, both IPS and TRS filed amended answers, with new defenses and counterclaims that specifically address the conduct of the parties after the purported settlement agreement entered into on December 14 and December 31, 1994. Both TRS and IPS assert the affirmative defense of implied license, as well as counterclaims for breach of the settlement agreement and patent misuse. In addition, IPS has asserted counterclaims of attempted monopolization, fraud, negligent misrepresentation and the affirmative defense of equitable estoppel.

Travelers now moves the Court for summary judgment on these affirmative defenses and counterclaims. IPS also moves for summary judgment as to the affirmative defense of implied license or, in the alternative, as to the affirmative defense of equitable estoppel.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir.1992). To determine whether genuine issues of material fact exist, the court determines materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. 2505.

### 1. Implied License—IPS

■ Both Travelers and IPS move for summary judgment as to IPS' affirmative defense of implied license. An implied license, like an express license, is a complete defense to a claim of patent infringement. *Carborundum Company v. Molten Metal Equipment Innovations, Inc.,* 72 F.3d 872, 878 (Fed.Cir.1995).

■ In the area of patent law, the granting of a license "signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.,* 103 F.3d 1571, 1580 (Fed.Cir.1997) *cert. denied,* 522 U.S. 818, 118 S.Ct. 69, 139 L.Ed.2d 30 (1997). A license may be express or implied.

No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for tort.

*De Forest Radio Tel. & Tel. Co. v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 71 L.Ed. 625 (1927). An implied license may arise by acquiescence, conduct, equitable estoppel or by legal estoppel. *Wang,* 103 F.3d at 1580 (citations omitted). "These labels describe not different kinds of licenses, but rather different categories of conduct which lead to the same conclusion: an implied license." *Id.* Whether an implied license exists is a question of law. *Carborundum,* 72 F.3d at 877. As the alleged infringer, IPS has the burden of establishing the existence of an implied license as an affirmative defense. *Id.*

■ IPS asserts that it has an implied license by equitable estoppel. A license by estoppel is created if IPS can show that 1) there is infringement by IPS; 2) Travelers had knowledge of the infringement; 3) Travelers engaged in conduct that induced IPS to believe that Travelers acquiesced in the infringement; and 4) IPS relied on Travelers conduct. *Mahurkar v. C.R. Bard, Inc.,* 1993 WL 259446, at *10, n. 10 (N.D.Ill.1993) (citations omitted).

■ There is no genuine dispute as to the first two elements. While IPS does not concede that it infringed any of Travelers' patents, Travelers believes there is infringement, and has filed suit as a result.[1] IPS argues that the third element is met as well, based upon Travelers' numerous statements to IPS, to third parties, and to the Court, that Travelers had granted it a license, and by Travelers' acceptance of $8.7 million in royalty payments. Finally, IPS argues the fourth element is met based upon the evidence that it spent millions on automated money

---

1. In so finding, the Court rejects out of hand Travelers' argument that IPS must concede or show infringement before an implied license is created. The case law does not support such an argument, and as pointed out by IPS, implied licenses have been found where the alleged infringer did not concede or show infringement. *See e.g., McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir.1995) *cert. denied,* 516 U.S. 1174, 116 S.Ct. 1268, 134 L.Ed.2d 215 (1996). *See also, Carborundum,* 72 F.3d at 878 (burden on alleged infringer to establish implied license.)

dispensers that utilized the allegedly infringing technology and by making future commitments to customers to provide dispensers that contain the allegedly infringing technology.

■ Travelers argues that the factual record does not support a finding of implied license by equitable estoppel, because IPS cannot show that it reasonably relied upon Travelers' statements or comments. It is Travelers' position that until a definitive settlement agreement was executed by the parties, any reliance by IPS to use the allegedly infringing technology was unreasonable. The Court disagrees. To establish an implied license, IPS need only show reliance. None of the authority cited by the parties requires a further showing of reasonableness. Nonetheless, the factual record supports a finding of reasonableness. For over a two and one-half year period, Travelers repeatedly asserted to the Court, the public and in internal newsletters that IPS was acting under a license. Even though the Court had not ruled on the motion to define the terms of the settlement, Travelers repeatedly conceded that IPS performed under the license consistent with Travelers' views as to its scope. Travelers was aware that IPS was utilizing its patented technology in its automated money dispenser business, and was aware that IPS had developed a new dispenser, which clearly required the expenditure of research and development costs. Yet, during the time period of January 1995 through May 1998, Travelers did not tell IPS to stop.

Travelers did benefit from this arrangement as well. Although IPS was disputing the terms of the settlement, IPS nonetheless performed according to Travelers' views during this period. Furthermore, Travelers utilized the opportunity by publicly announcing the settlement to tout the validity of its patents, and used the fact of the settlement to support its position in a separate lawsuit against Standard Register. Lewis Aff., Ex. D(7). It also received $8.7 million in royalty payments.

■ Travelers further asserts that given the fact that the parties could not agree as to the scope of the license, the Court will be in no better position to determine the scope of an implied license. Again, the Court does not agree. The scope of an implied license depends on the particular facts of the case. *Carborundum,* at 878. Thus, to determine the scope of the implied license, the Court must look to the course of conduct between Travelers and IPS. *McCoy,* 67 F.3d at 920. In a hearing before the Court in November 1997, Travelers conceded on the record that IPS conducted itself "entirely consistent" with Travelers' position on the disputed terms. Lewis Aff. Ex. D, (16). IPS also concedes that the scope of the implied license must be consistent with Travelers' view of the disputed issues as of January 1995. *See* IPS' Memorandum in Opposition to Travelers' Motion for Summary Judgment, p. 17 ("At minimum, the Court should apply the law to the facts and find IPS has the license from Travelers which the parties acted as if it did from January 1995 through May 1998. While that result amounts to a win for Travelers on the disputed settlement terms concerning the license it granted, at least it eliminates IPS' exposure under Travelers' renewed patent claims.") Because both parties agree that the license was performed according to Travelers' view of the license's scope, that is the scope of the implied license.

Equity favors this result. Both parties took a risk by going forward with a licensing arrangement even though they had not hammered out its terms. By finding that IPS had an implied license, Travelers gets the benefit of the bargain it believed it reached at the end of 1994, and IPS is now protected from Travelers' reasserted claims of patent infringement.

Contrary to Travelers' assertions, the finding of an implied license does not contradict the Court's earlier decision that the parties did not enter into a settlement agreement. In March 1995, the parties

asked the Court to do something it clearly had no authority to do—act as the final arbitrator and determine what the parties agreed to. *See, Ozyagcilar v. Davis,* 701 F.2d 306 (4th Cir.1983). By finding that an implied license exists, the Court is not making a determination as to what the parties meant when they prepared and signed the Settlement Term Sheet. Rather, the Court is simply looking to the conduct of the parties and by that conduct finding that the elements for an implied license exist.

## 2. Implied License—TRS

■ Travelers also moves for summary judgment on TRS' affirmative defense of implied license. To the extent that TRS was in business with IPS under the Management Agreement, TRS also should receive the benefit of an implied license. None of the evidence presented to the Court establishes otherwise. The Court disagrees with TRS that an implied license should extend beyond April 1997, when TRS and IPS parted ways.

Travelers asserts that in 1997, after its non-compete agreement with IPS expired, TRS approached Travelers to discuss a number of issues, including TRS' desire to re-enter the money order business. Tab D, Milne Dep., pp. 130–146. Travelers asserts that at that time, Travelers informed TRS that it was not interested in granting TRS a license. *Id.,* pp. 132–140. Thereafter, TRS did re-enter the money order business, utilizing technology that Travelers does not argue infringes its patents.

Although TRS disputes that it asked Travelers for a license in 1997, the facts nonetheless do not support a finding that TRS had an implied license when it re-entered the money-order business in 1998, given the fact that it does not use Travelers' patented technology.

The Court thus finds that TRS had an implied license during that period of time that it was acting under the Management Agreement with IPS. The course of conduct of the parties after the Management Agreement expired establish that no implied license exists.

## 3. Breach of Settlement Agreement

Both IPS and TRS have asserted counterclaims for breach of the settlement agreement. Travelers moves for summary judgment on these claims.

■ IPS and TRS assert that pursuant to the December 31, 1994 Agreement, Travelers unambiguously promised to settle its patent infringement claim and grant IPS and TRS a license. Their claims of breach of the settlement agreement arise under the doctrine of promissory estoppel. To succeed on a claim of promissory estoppel, Defendants must show that 1) there is a clear and definite promise; 2) Travelers intended to induce Defendants to rely on this promise and defendants reasonably relied on the promise to their detriment; and 3) the promise must be enforced to prevent an injustice. *Cohen v. Cowles Media Co.,* 479 N.W.2d 387, 391 (Minn.1992).

■ Travelers argues that Defendants cannot establish any of these elements. First, Travelers argues that the promise to settle the case and grant Defendants a license was not clear and definite, as the parties disputed many of the terms of the Settlement Term Sheet. Defendants respond that the December 31, 1994 Agreement is clear—it provides that the parties had settled, and agreed to live with the Court's decision about its terms. Nothing in this agreement reserved to Travelers' the right to decide to return the royalty payments made and move the Court for an order finding no enforceable settlement had been reached. In accepting the Defendants' arguments, the Court would have to construe the December 31, 1994 Agreement in a vacuum. But the December 31, 1994 Agreement necessarily involved the disputed issues concerning the Settlement Term Sheet. Thus, as Travelers argues, the agreement that the parties "had settled" is necessarily conditioned on the outcome of the Court's determination as to

the disputed terms of the Settlement Term Sheet. As such, the December 31, 1994 Agreement is not sufficiently "definite and clear" to support a claim for promissory estoppel.

The Court also finds that the December 31, 1994 Agreement need not be enforced to prevent an injustice. Whether this element of a promissory estoppel claim is established is a question of law. *Faimon v. Winona State University*, 540 N.W.2d 879, 883 (Minn.Ct.App.1995). "Numerous considerations enter into a judicial determination of injustice, including the reasonableness of a promisee's reliance and a weighing of public policies in favor of both enforcing bargains and preventing unjust enrichment." *Id.* In this case, justice does not require that the Court enforce the December 31, 1994 Agreement given the fact that the Court did not have the authority to interpret the terms of the Settlement Term Sheet as there was no meeting of the minds as to the agreement's terms. *See, Ozyagcilar*, 701 F.2d at 308.

### 4. IPS' claims of Fraud and Negligent Misrepresentation

 IPS asserts that Travelers committed fraud by its conduct and by various statements that it had settled the case and had granted IPS a license, but in 1998 it then announced that the parties had not settled and that IPS did not have a license. A fraud claim is proven by evidence which establishes that Travelers made a false representation of past or present fact. *Gorham v. Benson Optical*, 539 N.W.2d 798, 802 (Minn.Ct.App.1995). Statements made with the intent to act in the future do not establish fraud. *Hayes v. Northwood Panelboard Co.*, 415 N.W.2d 687, 690 (Minn.Ct.App.1987). Rather, IPS must put forth affirmative evidence that Travelers had no intention to perform at the time the parties entered into the December 31, 1994 Agreement. *Id.* IPS has not met this burden. "When a promise is made in good faith with the expectation of

carrying it out, the fact that it is subsequently broken does not give rise to a cause of action for fraud." *Id.* IPS has not presented the Court any evidence that Travelers did not act in good faith. Rather, Travelers interpreted the Settlement Term Sheet substantially different that IPS, and merely used the judicial process to enforce its position. Accordingly, summary judgment on IPS' counterclaim is appropriate.

 For the same reasons, IPS' claim for negligent misrepresentation fails. Additionally, in Minnesota a negligent misrepresentation claim will not lie between parties to a commercial transaction negotiating at arms length. *Kellogg Square Partnership v. Prudential Insurance Company of America*, 63 F.3d 699, 703 (8th Cir.1995) (citing *Safeco Ins. Co. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 872 (Minn.Ct.App.1995)). Accordingly, summary judgment on the negligent misrepresentation claim is appropriate as well.

### 5. Attempted Monopolization

IPS asserts that Travelers has attempted to raise its' and others' costs anticompetitively by disavowing its settlement with IPS unjustifiably and in a way to maximize harm to IPS and the market and by engaging in a series of sham lawsuits aimed at rivals' costs and deterring competition. IPS asserts that by eliminating it as a competitive threat, Travelers will gain market power, raise prices to money order agents and reduce agents' choice of money order issuers. IPS asserts that this conduct is actionable attempted monopolization under Section 2 of the Sherman Act.[2]

A patentee who brings an infringement suit may be subject to antitrust liability for the anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves 1) that the asserted patent was obtained through knowing and willful fraud ... or 2) that the infringe-

---

2. Travelers also moved for summary judgment on IPS' claims under Section 1 of the Sherman Act and Section 7 of the Clayton

Act. IPS did not oppose this aspect of Travelers' motion in its opposition brief.

ment suit was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed.Cir.1998) *cert. denied,* —— U.S. ——, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998). IPS is not asserting that Travelers obtained the patents at issue through fraud, thus the Court need only focus on whether the current suit is a sham.

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the Supreme Court defined what constitutes "sham litigation" for purposes of determining whether a patent infringement suit is entitled to antitrust immunity.

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect that success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor" ... through the "use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon".

*PRE,* 508 U.S. at 60–61, 113 S.Ct. 1920 (citations omitted). IPS argues that as Travelers has filed a series of meritless lawsuits against virtually all of its competitors and suppliers of automated money order dispensers, it is not appropriate to rely on the *PRE* test, as that case involved only a single case. IPS asserts that instead, this Court should rely on a series of Ninth Circuit cases that address the filing

of a series of allegedly meritless suits. However, the Federal Circuit has recently held that "whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law" as the Federal Circuit has exclusive jurisdiction over patent cases. *Nobelpharma,* 141 F.3d at 1067–1068. Although the Federal Circuit has not specifically ruled on the appropriateness of applying the *PRE* test in situations where the antitrust defendant is alleged to have brought a series of meritless suits, it nonetheless applied the *PRE* test in a case that involved two lawsuits and threats of analogous suits against other companies that were using or considering to use the antitrust defendant's patented technology. *Glass Equipment Development, Inc. v. Besten, Inc.*, 174 F.3d 1337, 1343–1344 (Fed.Cir.1999). It thus appears that the appropriate inquiry is to determine whether each of the prior lawsuits was objectively baseless, as well as the instant suit.

Thus, under the *PRE* test, the Court must first determine whether the lawsuits brought by Travelers were so objectively baseless "that no reasonable litigant could realistically expect success on the merits." *PRE,* at 60, 113 S.Ct. 1920. The Court has thoroughly reviewed the evidence presented by IPS in opposition to Travelers' motion for summary judgment on the antitrust claim and finds that IPS has failed to present evidence which creates a genuine issue of fact that any of Travelers' lawsuits involving the patented technology at issue herein were objectively baseless. With regard to the prior suit against American Express, the former parent company of IPS and parent of TRS, Travelers was simply found to have sued the wrong party. Nothing has been presented to this Court which suggests Travelers instituted that suit in bad faith. With regard to the lawsuits filed against Entronics, CBC and Standard Register, IPS has not presented any evidence to suggest these suits were objectively baseless. Where an antitrust counterclaim is based on a patent holder's

attempts to enforce its right to exclude others from practicing the methods claimed in its patent, "there is no reasonable possibility that the [antitrust] counterclaim could succeed." *GED,* at 1344.

The evidence that IPS has presented goes to Travelers' subjective intent on bringing a series of lawsuits against competitors. As the Court made clear in *PRE,* however, this Court must only consider the issue of an antitrust defendant's subjective intent if it is shown that the suits were objectively baseless. *Id.* at 60, 113 S.Ct. 1920. As IPS as failed to make this initial showing, Travelers' subjective intent is irrelevant.

IPS also attempts to take this case from under the umbrella of *PRE* by arguing that Travelers engaged in antitrust activity when it brought the Rule 16 motion in June of 1998. Because the instant suit had not been settled at the time the motion was brought, and because the Court was without any authority to interpret the terms of the Settlement Term Sheet, the Court finds that Travelers was entitled to use judicial process to bring the case to an end. Travelers was merely using the adjudicatory process to obtain a favorable outcome, entitling it to immunity. *See e.g., St. Joseph's Hospital, Inc. v. Hospital Corporation of America,* 795 F.2d 948, 955 (11th Cir.1986).

IT IS HEREBY ORDERED that:

1. Plaintiff Travelers' Motion for Summary Judgment is GRANTED as to IPS' First Counterclaim of Attempted Monopolization, Second Counterclaim for Fraud, Third Counterclaim for Negligent Misrepresentation, Fourth Counterclaim for Breach of Settlement Agreement. Travelers' Motion for Summary Judgment is DENIED as to IPS' Eighth Affirmative Defense of License.

2. Plaintiff Travelers' Motion for Summary Judgment is GRANTED as to TRS' Counterclaim for Breach of Settlement Agreement and DENIED as to TRS' Fifth Affirmative Defense of License, to the extent that IPS and TRS were working pursuant to a Management Agreement that expired April 1997, and GRANTED to the extent that TRS did not operate under an implied license after April 1997.

3. Defendant IPS' Motion for Summary Judgment as to its Eighth Affirmative Defense of License is GRANTED. IPS shall reimburse to Travelers' $10,-035,332, which amount represents royalty payments made and interest thereon, within ten (10) days from the date of this order.

4. Defendant IPS' Motion to Strike is DISMISSED AS MOOT.