**CHRISTIAN MEMORIAL CULTURAL CENTER, INC., Plaintiff,**

v.

**MICHIGAN FUNERAL DIRECTORS ASSOCIATION and Richard Bryan, Defendants.**

**No. Civ.A. 97–40416.**

United States District Court,
E.D. Michigan,
Southern Division.

March 6, 1998.

---

Marilyn A. Peters, Dykema, Gossett, Bloomfield Hills, MI, for Christian Memorial Cultural Center, Incorporated, plaintiff.

Peter H. Webster, Bowman & Brooke, Detroit, MI, for Michigan Funeral Directors Association, defendant.

*MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DISMISSING PLAINTIFF'S APPLICATION FOR CLERK'S ENTRY OF DEFAULT*

GADOLA, District Judge.

Before the court is a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) filed by defendants, Michigan Funeral Directors Association ("MFDA") and its executive director, Richard Bryan. For the reasons set forth below, this court will grant defendants' motion in part, and deny it in part.

**Factual Background**

Plaintiff, Christian Memorial Cultural Center, Inc., owns and operates a cemetery. As part of its business, plaintiff sells funeral goods, such as caskets. Defendant MFDA is a non-profit corporation and trade association comprised of owners and operators of funeral homes. Defendant Bryan is the executive director of MFDA.

Plaintiff conducts "pre-need" sales of certain funeral goods. That is, plaintiff sells the goods to customers before the death of the intended user. The State of Michigan regulates pre-need sales of funeral goods through the Prepaid Funeral Contracting Funding Act ("Prepaid Act"), Mich.Comp.Laws §§ 328.211–235. The Prepaid Act provides that all persons who sell funeral goods which, though purchased pre-need, will not be delivered until after death, are required to escrow at least 90% of the retail price in a merchandise trust account. The Prepaid Act defines a "prepaid funeral contract" as a contract:

> requiring payment in advance for funeral services or for funeral goods, *physical delivery and retention of which would occur after death....* Prepaid funeral contracts shall not include a contract for the sale of funeral goods or funeral services which is entered into after the death of the person for whose benefit the goods or services are acquired.

Mich.Comp.Laws § 328.215(3) (emphasis added).

To avoid the requirements of the Prepaid Act, plaintiff, and other cemeteries, place the funeral goods in storage after the sale, and provide the pre-need buyer with a warehouse receipt. This practice is called "warehousing." Plaintiff contends that delivery of a warehouse receipt constitutes "delivery" of the goods before death because the receipt entitles the pre-need buyer to obtain possession of the goods at any time. Hence, plaintiff contends that the contract of sale is not a "prepaid funeral contract" subject to regulation by the Prepaid Act. The Michigan Attor-

ney General concurred with this view, indicating:

> It is my opinion ... that the escrow provisions of the [Prepaid Act] do not apply to a contract for the sale exclusively of funeral goods when the seller delivers and surrenders control over the goods to a bona fide, third party warehouse which then issues a warehouse receipt to the buyer.

Op.Mich. Att'y Gen. 6656 (1990).

However, the MFDA has taken the position that warehousing does not relieve the cemeteries of their obligations in pre-need sales under the Prepaid Act. MFDA claims that delivery of the warehouse receipt does not constitute "physical delivery and retention" before death which would exempt the transaction from coverage by the Prepaid Act.

The instant complaint is based on plaintiff's allegations that defendants have conspired to drive plaintiff and other cemeteries out of the funeral goods market. Plaintiff points to a number of actions taken by defendants which it asserts are evidence of unfair competition. Defendants have sued various cemeteries engaged in warehousing, including plaintiff.[1] Defendants have also engaged in a variety of administrative and legislative lobbying efforts in an attempt to combat the practice of warehousing. Plaintiff asserts that defendants have taken these actions without regard to their merits, and only to eliminate competition in the funeral goods market. Plaintiff also contends that defendants have engaged in more direct tactics such as directly interfering with plaintiff's customers, refusing to service caskets sold by plaintiff and other cemeteries and characterizing plaintiff's warehousing activities as "con games," "shams" and "illegal schemes."

Plaintiff uses these factual allegations to support its three count complaint. Count I asserts claims under the Sherman Act, 15 U.S.C. § 1, Count II asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and Count III asserts claims under the Lanham

Act, 15 U.S.C. § 1125(a). The instant motion to dismiss pertains to Counts I and II.

At the outset, this court will dispose of two matters. First, at the oral argument on the instant motion on January 21, 1998, plaintiff agreed to voluntarily dismiss Count II of its complaint, which contains the RICO claims. Accordingly, by stipulation of the parties on the record at the hearing, this court will dismiss Count II of plaintiff's complaint.

Second, plaintiff filed an application for clerk's entry of default with respect to Count III. Defendants have since filed a response to Count III. At oral argument, plaintiff agreed on the record to withdraw its application for clerk's entry of default. Accordingly, by stipulation of the parties on the record at the hearing, this court will dismiss plaintiff's application for clerk's entry of default.

What is left before this court is the motion to dismiss the claims of antitrust violation contained in Count I of plaintiff's complaint.

## Discussion

### 1. Standard for dismissal pursuant to Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes the district courts to dismiss any complaint which fails "to state a claim upon which relief can be granted." Rule 12(b)(6) affords the individual defendants in this case an opportunity to test whether, as a matter of law, the plaintiff is entitled to legal relief on its complaint even if everything alleged in the complaint is true. In applying the standards under Rule 12(b)(6), the court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993); *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir. 1995). The court need not, however, accord the presumption of truthfulness to any legal conclusion, opinions or deductions, even if they are couched as factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 629 (9th Cir.1981); *Mitchell v. Archibald & Kendall, Inc.,* 573 F.2d 429, 432 (7th Cir.

---

1. The Prepaid Act specifically provides for a private right of action to enforce its terms. Mich. Comp.Laws § 328.234.

1978); *Sexton v. Barry*, 233 F.2d 220, 223 (6th Cir.1956). Dismissal for failure to state a claim is disfavored:

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Cameron v. Seitz*, 38 F.3d 264, 270 (6th Cir.1994) (stating that a motion to dismiss should be denied unless "it is clear that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief").

### 2. Analysis of the antitrust claims

The claims contained in Count I of plaintiff's complaint in this action fall into two major categories. The first category involves allegations that defendants have engaged in objectively baseless litigation, administrative action and legislative lobbying in an effort merely to harass plaintiff and drive it and other cemeteries out of the funeral goods market. These petitioning activities are arguably protected by the First Amendment and are subject to analysis under the Supreme Court's *Noerr–Pennington* doctrine.

The second category contains allegations that defendants have directly interfered with plaintiff's customers, refused to service customers who purchased funeral goods from plaintiff and publicly characterized plaintiff as engaging in "con games" and "shams."

### a. Claims subject to *Noerr–Pennington*

 The general rule established by *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), is that those who petition the government for redress are generally immune from antitrust liability. The rule was originally directed at attempts to influence legislation, but the Supreme Court expanded the application of the rule to include approaches to administrative agencies and courts in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The rule is based on the idea that the First Amendment protects a citizen's right to petition the government in order to influence its action. However, where petitioning activity, ostensibly directed toward influencing governmental action, is actually a mere "sham" to cover an attempt to interfere directly with the business relationships of a competitor, then the application of antitrust liability may apply. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

In the instant case, plaintiff's complaint alleges that defendants have engaged in a number of petitioning activities that were designed only to drive plaintiff and other cemeteries out of the funeral goods market. These include the filing of at least three state court lawsuits directly challenging the practice of "warehousing." Plaintiff also alleges that defendants have recruited plaintiffs to bring separate class action lawsuits concurrently with the MFDA lawsuits. Plaintiff contends that the engineering of two separate suits aimed at essentially the same relief shows that defendants are only using the litigation process to strap plaintiff, and other cemeteries, with the burden of defending the cases, rather than engaging in a legitimate attempt to change or enforce the law. Plaintiff also asserts that defendants have engaged in various legislative and administrative lobbying efforts in an attempt to harass plaintiff and other cemeteries and drive them out of the funeral goods market.

Defendants base their motion to dismiss on the claim that these activities are protected by *Noerr–Pennington*.

 This court will begin with the allegations that defendants have engaged in improper litigation. In *Professional Real Estate*, the Supreme Court defined a two element test for determining what constitutes a "sham" litigation. First, the filing of the lawsuit must be "objectively baseless" in the sense that no reasonable litigant could reasonably expect to prevail on the merits. If the lawsuit is not objectively baseless, the suit is protected by *Noerr–*

*Pennington* regardless of the subjective anticompetitive intent that may be motivating the lawsuit. However, if the suit is objectively baseless, then the court must examine the subjective intent of the party bringing suit to inquire whether the suit is aimed at achieving a favorable *outcome*, or whether the suit is aimed at hindering the competitor through the mere *process* of litigation.

■ Here, plaintiff relies primarily on the Michigan Attorney General's Opinion that declares warehousing with a bona fide third party warehouser does not implicate the Prepaid Act (*see* discussion, p. 2, *supra*). Defendant counters by pointing to the only opinion rendered by a state court judge addressing this issue. *Estate of Tunier v. Mount Ever-Rest Mem'l Park, Inc.*, 90–3340 (November 25, 1992). *Estate of Tunier* involved an attack on a cemetery's practice of warehousing by the MFDA and a class of individual plaintiffs who had bought funeral goods pre-need. In that case, the court concluded that, despite the Michigan Attorney General's Opinion, warehousing does implicate the Prepaid Act, and as a result, the MFDA and other plaintiffs were successful in obtaining summary disposition against the cemetery. The court did distinguish *Estate of Tunier* from the case contemplated by the Attorney General on the basis that the warehouse in *Estate of Tunier* was operated by the cemetery and not a third party. However, the court also took pains to indicate that the words "physical delivery and retention" in the statute did not equate to constructive delivery, as that term has been applied generally in law. The Michigan Attorney General's Opinion relied heavily on the premise that a warehouse receipt constituted constructive delivery before death, which according to the Attorney General, exempted those transactions from the Prepaid Act. The court in *Estate of Tunier* held that, though the delivery of the warehouse receipt may constitute "constructive delivery" of the goods before death, it is not the "physical delivery and retention" before death required to exempt the transaction from coverage under the Prepaid Act.

Given the holding of the court in *Estate of Tunier*, it is difficult, if not impossible, to conclude that the lawsuits filed by MFDA against cemeteries such as plaintiff, directed toward stopping the practice of warehousing, were objectively baseless. If the only court to directly decide the issue has declared that delivery of a warehouse receipt does not constitute "physical delivery and retention" of funeral goods as provided in the Prepaid Act, it seems clear that MFDA could reasonably conclude that it has a reasonable expectation of success on the merits. The legality of warehousing depends on the interpretation that the delivery of a warehouse receipt constitutes "physical delivery and retention." While every court may not view the statute in the way the *Estate of Tunier* court did, that courts' decision certainly gives defendants a reasonable expectation of success.

At oral argument, plaintiff's counsel took great pains to offer ways in which plaintiff's operations could be distinguished from the operations of the cemetery in *Estate of Tunier*. However, plaintiff's counsel's argument is misplaced. The question before this court is not whether a court faced with the allegations in the underlying action between MFDA and plaintiff could reasonably render a decision against MFDA. Rather, the question is whether MFDA has *any reasonable expectation* of success in its lawsuit. Given the holding of the court in *Estate of Tunier*, the answer to the latter question is clearly that MFDA does have such a reasonable expectation of success.

Accordingly, under the definition of sham litigation offered by the Supreme Court in *Professional Real Estate*, defendants' lawsuits are protected by *Noerr–Pennington* without regard to any subjective anticompetitive motives.[2]

2. Plaintiff offers the argument, based on the Ninth Circuit's decision in *USS–POSCO Indus. v. Contra Costa County Bldg. & Constr.*, 31 F.3d 800 (9th Cir.1994), that the *Professional Real Estate* test for sham litigation only applies in cases where there is a single lawsuit at issue. Plaintiff contends that there are multiple lawsuits at issue here, and thus asks this court to employ the standard set forth *California Motor*. However, the courts in this circuit that have confronted similar issues since *Professional Real Estate* was decided (*see, e.g., Re/Max Int'l v. Realty One, Inc.*, 900 F.Supp. 132, 159 (N.D.Ohio 1995)), have declined to read *Professional Real Estate* so nar-

■ With respect to defendants' legislative and administrative lobbying efforts, again it is difficult to conclude that these efforts could be viewed only as illegitimate harassment. Plaintiff relies on *California Motor*, in which the Supreme Court remanded the matter for trial, reversing the district court's decision to grant defendants' motion to dismiss on the basis of *Noerr–Pennington* immunity. The Supreme Court did note that the complaint alleged that defendants had engaged in a conspiracy to put its competitors, including plaintiff, out of business, and that claim is similar to an allegation made by plaintiff in this case. However, the Court did not rest its holding on this allegation alone. Rather, the Court indicated:

> More critical are other allegations ... which elaborate on the 'sham' theory by stating that the power, strategy, and resources of the petitioners were used to harass and deter respondents in their use of administrative and judicial proceedings so as to deny them 'free and unlimited access' to those tribunals. The result, it is alleged, was that the machinery of the agencies and the courts was effectively closed to respondents, and petitioners indeed became the regulators of the grants of rights, transfers and registrations to respondents....

*California Motor*, 404 U.S. at 511. Plaintiff does not make any similar allegations in the instant case. Rather, plaintiff focuses almost exclusively on the malicious anticompetitive intent with which defendants are alleged to have pursued their legislative and administrative lobbying efforts. However, as the Supreme Court made clear in *Professional Real Estate*, "[the Court has] repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." *Professional Real Estate*, 508 U.S. at 58 (citations omitted).

In this case, it is clear that defendants have an objectively legitimate basis for lobbying the legislature and administrative agencies in an attempt to obtain an explicit

ruling that warehousing is illegal under the Prepaid Act. The court in *Estate of Tunier* explicitly adopted much of the reasoning used by defendants in their lobbying efforts. Whether or not warehousing does in fact conflict with the Prepaid Act, plaintiff is not able to claim that the lobbying efforts were objectively baseless. Moreover, the claim that defendants intended to drive plaintiff and other cemeteries out of the funeral goods market will not, without more, support the argument that these petitioning activities fall within the "sham" exception to *Noerr–Pennington*. This court notes that dismissal for failure to state a claim at this stage of the proceedings is disfavored. However, plaintiff's request in this case is that it be allowed to take discovery which might support its claims. Even if plaintiff obtained evidence supporting every factual allegation in the complaint, it would be unable to show that defendants petitioning activities fall under the sham exception to *Noerr–Pennington*.

Accordingly, this court will grant defendants' motion to dismiss as it pertains to the petitioning activities subject to analysis under *Noerr–Pennington*, and dismiss that part of Count I.

### b. The allegations of direct interference

■ Count I also contains allegations of direct interference with plaintiff and its customers. These allegations include claims that defendants have conspired to eliminate competition in the funeral goods market by refusing to service customers who have purchased funeral goods from plaintiff and other cemeteries and publicly characterizing plaintiff's casket sales as "con games" and "shams." Plaintiff asserts correctly that these activities do not involve attempts to influence government policy and so are not protected by *Noerr–Pennington*.

■ Defendants' primary argument in relation to these claims is that they involve regular business tort injuries, and not antitrust injuries, and as such are not remediable under Count I of plaintiff's complaint. Defendants argue that "vague allegations of

rowly. Moreover, because only one action in state court actually involves these two parties, it appears that even under such a narrow reading,

*Professional Real Estate* would apply to this case. Accordingly, this court rejects plaintiff's argument.

disparagement in the antitrust context do not allege antitrust injury." *Re/Max Int'l,* 900 F.Supp. at 159. They further contend that "[w]hile [defamatory] comments certainly may have the effect of damaging [plaintiff's] professional reputation, such conduct is not the type of conduct the antitrust laws were enacted to prohibit or punish." *Broyles v. Wilson,* 812 F.Supp. 651, 655 (M.D.La.1993).

This court will reject defendants' argument, and allow plaintiff to conduct discovery on the issues of direct interference. Plaintiff has alleged a conspiracy to impact consumers and a relevant market, which is precisely the kind of injury the antitrust laws are designed to prohibit. This case is distinguishable from those relied upon by defendant in that those cases involved allegations of only an indirect impairment of the ability to compete based on harm to the reputation of individual plaintiffs. For example, defendants rely on *Mar Food Corp. v. Doane,* 405 F.Supp. 730, 731 (N.D.Ill.1975), in which the court dismissed a claim under the Sherman Act, holding that the plaintiffs "failed to allege a lessening of competition within a defined market which in any way injures the public." In this case, plaintiff has alleged a conspiracy to directly influence consumers by use of a public campaign against specific services in a specific market in order to deprive consumers of a choice. Whether or not plaintiff will be able to establish these claims is another matter, but it certainly is not the question before this court when considering a motion to dismiss under Rule 12(b)(6).

Accordingly, this court will deny defendants' motion with respect to the allegations of direct interference in count I.

**Conclusion**

Therefore, this court having reviewed the submissions of the parties, and being fully advised in the premises,

**IT IS HEREBY ORDERED** that defendants' motion to dismiss Counts I and II of plaintiff's complaint, pursuant to Fed. R.Civ.P. 12(b)(6), is **GRANTED in part and DENIED in part** in accordance with the terms set forth in this opinion.

**IT IS FURTHER ORDERED** that a portion of Count I and all of Count II of plaintiff's complaint are **DISMISSED with prejudice** in accordance with the terms set forth in this opinion.

**IT IS FURTHER ORDERED** that plaintiff's application for clerk's entry of default as to Count III of plaintiff's complaint is **DISMISSED** by stipulation of the parties on the record at the January 21, 1998 hearing in this matter.

**SO ORDERED.**