GREENBERG, Circuit Judge,
dissenting.
I concur with and join in Sections I, the background section, and II.A.', the antitrust standing section, of Judge Fuentes’s opinion. Thus, I agree with his conclusion in Section II.A. that plaintiff, Hanover 3201 Realty, LLC (“3201 Realty”), has antitrust standing in the full-service supermarket market but not in the full-service supermarket rental space market. I cannot agree, however, with Judge Fuentes’s opinion to the extent that I believe it expands the sham exception to Noerr-Pen-nington immunity. I decline to join in this aspect of Judge Fuentes’s opinion because: (1) 3201 Realty has not properly preserved the issue; (2) no court of which. I am aware has applied the expanded exception in circumstances comparable to those here; and (3) the expansion of the sham exception comes with a questionable pedigree. I therefore conclude that the legal challenges to 3201 Realty’s development project that Village Supermarkets, Inc. (“Village”) brought on behalf of itself and Hanover and Horsehill Development LLC fall within the antitrust immunity afforded to petitioning activity under the Noerr-Pennington doctrine.[1] In light of this conclusion and Judge Ambro’s conclusion that 3201 Realty does not have anti *197 trust standing, two of the three members of this panel believe that the District Court correctly dismissed the complaint.
In coming to my conclusion that the District Court correctly dismissed the complaint I recognize that a majority of the panel, Judge Fuentes and I, believe that the District Court in part erred in concluding that 3201 Realty lacks antitrust standing. But that error does not require us to reverse the Court’s judgment because an appellate court may affirm an order granting a motion to dismiss on “any ground supported by the record.” Hildebrand v. Allegheny Cnty., 757 F.3d 99, 104 (3d Cir.2014) (quoting Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir.1999)), cert. denied, — U.S.-, 135 S.Ct. 1398, 191 L.Ed.2d 359 (2015). Here, the opinions of the members of the panel demonstrate that a majority of the panel believe that there is such support in the record because I accept defendants’ contention that the Noerr-Pennington doctrine immunizes them from antitrust liability for their allegedly anticompetitive judicial and administrative challenges to 3201 Realty’s development project, and Judge Ambro accepts defendants’ contention that 3201 Realty did not have antitrust standing.[2] Thus, I reiterate that Judge Ambro and I believe that the District Court reached the correct result, though in part on a basis that differs from that on which the Court relied. Accordingly, though the panel is reversing, it should be affirming.
1. THE NOERR-PENNINGTON DOCTRINE' IMMUNIZES DEFENDANTS’ CONDUCT FROM ANTRI-TRUST LIABILITY.
A. Relevant Law
The Noerr-Pennington doctrine draws its name from the Supreme Court’s opinions in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). It derives in part from the First Amendment right to petition the government. Octane Fitness, LLC v. ICON Health & Fitness, Inc., — U.S.-, 134 S.Ct. 1749, 1757, 188 L.Ed.2d 816 (2014); BE & K Constr. Co. v. NLRB., 536 U.S. 516, 524-25, 122 S.Ct. 2390, 2395-96, 153 L.Ed.2d 499 (2002). Under the doctrine, petitioners for “government ... redress are generally immune from antitrust liability” when defending against antitrust claims predicated on this petitioning activity. Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56, 113 S.Ct. 1920, 1926, 123 L.Ed.2d 611 (1993) (“PRE”); see A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239, 250 (3d Cir.2001). The doctrine applies not only to lobbying activity but also “to efforts to influence administrative agency action and efforts to access the court system.” Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 131 n. 13 (3d Cir.2005) (citation omitted); see Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 611-12, 30 L.Ed.2d 642 (1972); Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 122 (3d Cir.1999). Indeed, “Mailing concerns about a proposed development to the attention of the responsible state agencies [and courts] lies at the core of privileged activity.” Herr v. Pequea Twp., 274 F.3d 109, 121 (3d Cir.2001).
3201 Realty argues that the Noerr-Pen-nington doctrine does not immunize defen *198 dants for their conduct because the allegedly anticompetitive legal challenges to the development project fall within the so-called “sham” exception to the doctrine. In PRE, the Supreme Court established a two-prong test for determining the applicability of this exception including both objective and subjective components. See 508 U.S. at 60-61, 113 S.Ct. at 1928. Under the objective prong, the plaintiff must show that the defendant’s petitioning was “objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.” BE & K Constr., 536 U.S. at 526, 122 S.Ct. at 2396 (quoting PRE, 508 U.S. at 60, 113 S.Ct. at 1928). A plaintiff cannot make this showing if the defendant’s petitioning activity has succeeded as “a successful ‘effort to influence governmental action ... certainly cannot be characterized as a sham.’” PRE, 508 U.S. at 58, 113 S.Ct. at 1927 (alteration in original) (quoting Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 502, 108 S.Ct. 1931, 1938, 100 L.Ed.2d 497 (1988)).
On the other hand, even if a defendant’s petitioning activity was unsuccessful, that failure does not prove that it did not have an objective basis for the activity. See id. at 60 n. 5, 113 S.Ct. at 1928 n. 5; Herr, 274 F.3d at 119. Moreover, “even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.” PRE, 508 U.S. at 60 n. 5, 113 S.Ct. at 1928 n. 5 (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978)). The second, subjective prong for establishing the sham exception to Noerr-Pennington immunity, comes into play only if the plaintiff first makes a showing satisfying the exception’s objective prong. See PRE, 508 U.S. at 60, 113 S.Ct. at 1928; Cheminor, 168 F.3d at 123 n. 10. Accordingly, a defendant’s anticompetitive intent in engaging in petitioning activity is immaterial if it had probable cause for its activity. See PRE, 508 U.S. at 62, 113 S.Ct. at 1929.
In an effort to avoid the need to satisfy PRE’s threshold objective prong, 3201 Realty contends that the PRE test applies only where the defendants institute a single legal action and not where, as here, the defendants brought multiple legal challenges to the plaintiffs enterprise. 3201 Realty supports this position by pointing to eases from other courts of appeals holding that “where the defendant is accused of bringing a whole series of legal proceedings,” “the question is not whether any one of them has merit — some may turn out to, just'as a matter of chance — but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.” USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO, 31 F.3d 800, 811 (9th Cir.1994); accord Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27, 728 F.3d 354, 363-64 (4th Cir.2013); Primetime 2U Joint Venture v. Nat’l Broad., Co., 219 F.3d 92, 101 (2d Cir.2000).
Judge Ambro and Judge Fuentes accept 3201 Realty’s argument circumventing the need to satisfy the objective prong of the dual-prong PRE test. I believe, however, that the argument should fail for at least three independent reasons. First, 3201 Realty did not raise this argument until it filed its supplemental reply brief in this Court. Beyond a mere “failure to cite particular cases within its broader argument for the sham exception,” majority typescript at 30 n. 12, 3201 Realty conceded before the District Court that it had to satisfy PRE’s two-prong test and first show that any allegedly anticompeti-tive “lawsuit or other petitioning activity *199 [was] objectively baseless,” Pl.’s Br. in Opp’n to Mot. to Dismiss at 9 (citing PRE, 508 U.S. at 60, 113 S.Ct. at 1928). I therefore would hold that 3201 Realty has waived any argument excusing it from having to establish that defendants’ actions were objectively baseless. See Erdman v. Nationwide Ins. Co., 582 F.3d 500, 507 n. 2 (3d Cir.2009) (holding that plaintiff waived argument by conceding the point at issue on the appeal in the district court and explaining that her discovery of the argument upon “ ‘further reading’ while preparing [her] appeal” did not justify overlooking the waiver); Bryant v. Military Dep’t of Miss., 597 F.3d 678, 694 (5th Cir.2010) (holding that by not raising it before the district court, plaintiff waived the argument that “the ‘objectively baseless’ standard ought to be applied in some different, and presumably favorable way in this case because multiple lawsuits were filed against him”).
Second, even putting aside the waiver problem, the very case law applying the alternative test for which 3201 Realty advocates, i.e., not applying the PRE two-prong test which includes an objective component in situations in which a defendant has instituted a series of legal actions, demonstrates that the single lawsuit and three administrative challenges that defendants initiated do not rise to the level of “a whole series of legal proceedings” so as to trigger the applicability of the alternative test. See In re Flonase Antitrust Litig., 795 F.Supp.2d 300, 309 n. 10 (E.D.Pa.2011) (“No court has applied the USS-POSCO test to a ‘series’ of five petitions.... ”); see also ERBE Elektromedizin GmbH v. Canady Tech., LLC, 629 F.3d 1278, 1291-92 (Fed.Cir.2010) (even assuming alternative test applied, no “series” based on defendant filing three lawsuits); Amarel v. Con-nell, 102 F.3d 1494, 1519 (9th Cir.1996) (no “series” where defendants initiated two lawsuits and administrative proceedings); Ludwig v. Superior Court, 37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 365 n. 33 (1995) (“[A] total of four activities, two of which are not meritless as a matter of law, cannot constitute such a pattern [of baseless opposition].”). Thus, while Judge Ambro and Judge Fuentes adopt the test of other courts of appeals limiting this application of PRE, it seems to me that they do not correctly apply the case law based on that test, declaring instead that in the present circumstances, though not in others, four actions qualify as a “series.”[3] Majority typescript at 33-34. In reality, the four legal challenges that defendants initiated pale in comparison to the 29 in USS-POSCO, 31 F.3d at 811; the 14 in Waugh Chapel, 728 F.3d at 365; and the thousands in Primetime 21, 219 F.3d at 101.
Third, even overlooking both 3201 Realty’s waiver of a challenge to the applicability of the two-prong PRE test and the consideration that the courts that have adopted the alternative intent-based test would not apply it in the circumstances we face, I harbor doubts about whether the courts limiting the applicability of PRE have identified a proper exception to that case’s two-part test. This purported exception rests on a case on which Judge Ambro and Judge Fuentes heavily rely decided prior to PRE in which the Supreme Court explained: “One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused.” Cal. Motor Transp., 404 U.S. at 513, 92 S.Ct. at 613. Yet it seems to me that the Court’s reference to “a pattern of *200 baseless, repetitive claims” makes clear that this language comes into play only where a plaintiff first can satisfy what ultimately became PRE’s first prong; otherwise, the Court’s use of the word “baseless” would serve no purpose. But the use of “baseless” did serve a purpose because the Court in PRE pointed to this very language as demonstrating that “[n]othing in California Motor Transport retreated” from “an indispensable objective component” in establishing the sham exception. 508 U.S. at 58, 113 S.Ct. at 1927.
In a ruling employing the understanding of PRE that I think is appropriate, we applied the objective prong to uphold a claim of Noerr-Pennington immunity in a case similar to this one where the defendants challenged a plaintiffs land development project in multiple judicial and administrative proceedings. See Herr, 274 F.3d at 115-16, 118-19. Other courts also have rejected the proposed exception to the PRE test advanced here that would dispense with the need to show that the defendant’s activity lacked an objectively reasonable basis. See Travelers Express Co. v. Am. Express Integrated Payment Sys., Inc., 80 F.Supp.2d 1033, 1042 (D.Minn.1999) (applying PRE rather than Court of Appeals for the Ninth Circuit’s test even though defendant filed “a series of allegedly meritless suits”); Christian Mem’l Cultural Ctr., Inc. v. Mich. Funeral Dirs. Ass’n, 998 F.Supp. 772, 777 n. 2 (E.D.Mich.1998) (“[T]he courts in this circuit that have confronted similar issues [of whether an exception to PRE exists where the defendant initiated multiple lawsuits] have declined to read [PRE ] so narrowly.” (citation omitted)).
I appreciate the animating concern of other courts of appeals that an antitrust defendant’s fortuitous success in a-small number of lawsuits should not automatically immunize the defendant from the antitrust consequences of initiating a whole series of anticompetitive legal challenges. See Waugh Chapel, 728 F.3d at 365; Primetime 24, 219 F.3d at 101; USS-POSCO, 31 F.3d at 811. But we should not alleviate this concern by excusing a plaintiff from having to show the objective baselessness of even a single action brought by the defendant. After all, if Noerr-Pennington immunity shields objectively reasonable actions when considered individually, it should continue to shield them when they are aggregated. Cf. Pennington, 381 U.S. at 670, 85 S.Ct. at 1593 (holding that immunity extends to petitioning conduct “either standing alone or as part of a broader scheme”).
Judge Ambro and Judge Fuentes reason that the alternative test makes more sense when dealing with multiple legal challenges because having a larger sample of challenges than a single challenge enables the court to better “assess whether a defendant has misused the governmental process to curtail competition.” Majority typescript at 32. Yet this approach treats PRE’s objective prong as more akin to an evidentiary rule of thumb for determining whether the defendant possessed an anti-competitive purpose, rather than the independent and threshold requirement that it unmistakably represents. See 508 U.S. at 57, 113 S.Ct. at 1926 (“[A]n objectively reasonable effort to litigate cannot be sham regardless of subjective intent.”); id. at 59-60, 113 S.Ct. at 1928 (“We [earlier] dispelled the notion that an antitrust plaintiff could prove a sham merely by showing that its competitor’s ‘purposes were to delay [the plaintiffs] entry into the market and even to deny it a meaningful access to the appropriate ... administrative and legislative fora.’ ” (second and third alterations in original) (quoting Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 381, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991))). Perhaps for this reason, some *201 courts applying an approach similar to that of Judge Ambro and Judge Fuentes have preserved the need for showing the objective baselessness of the defendant’s action as a prerequisite for establishing the sham exception. See, e.g., In re Terazosin Hydrochloride Antitrust Litig., 335 F.Supp.2d 1336, 1367 (S.D.Fla.2004) (rejecting claim of sham litigation because “none of the lawsuits, individually, can be considered objectively baseless”); Gen-Probe, Inc. v. Amoco Corp., 926 F.Supp. 948, 959 (S.D.Cal.1996) (“[U]nder either the PRE or the USS-POSCO test, [the plaintiffs] claims against [the defendants] must demonstrate objective baselessness.”).
When I consider these questions regarding the legal support for abandoning a threshold objective baselessness requirement, I cannot acquiesce in the adoption of a test where the argument supporting the adoption has not been advanced properly and the test is being applied in circumstances beyond those recognized by other courts that have adopted the test abandoning the objective component of PRE. I therefore would hold that 3201 Realty cannot circumvent a Noerr-Pennington immunity defense without first showing that defendants’ legal challenges were objectively baseless.[4]
B. Application of PRE to Present Case
I now turn to the question of whether 3201 Realty can show that defendants’ activities were objectively baseless. I initially point out that 3201 Realty arguably has waived this issue, which is distinct from the question of whether to apply the alternative test that does not require objective baselessness, by not adequately arguing it on appeal. 3201 Realty’s supplemental re *202 ply brief starts from the premise that the alternative test to PRE applies but does not assert that defendants’ legal challenges lacked an objectively reasonable basis, and only briefly suggests that defendants did not have standing to bring these challenges or that the challenges otherwise lacked merit. See, e.g., John Wyeth & Bro. Ltd. v. CIGNA Int’l Corp., 119 F.3d 1070, 1076 n. 6 (3d Cir.1997) (“[Ajrguments raised in passing ..., but not squarely argued, are considered waived.”). Nevertheless, I will give 3201 Realty the benefit of the doubt and consider the arguments that defendants’ actions were objectively baselessness to which it alluded in its supplemental reply brief. 3201 Realty simply cannot meet the objective baselessness standard that PRE recognized.
Where the complaint fails at least to raise a question of fact on a sham petitioning issue, a court may reject the claim by granting a motion to dismiss. See PRE, 508 U.S. at 63, 113 S.Ct. at 1930 (“Where, as here, there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law.”); AD. Bedell, 263 F.3d at 241 (affirming dismissal under Fed.R.Civ.P. 12(b)(6) of antitrust claims based on Noerr-Pennington doctrine). .
In arguing that defendants’ legal challenges were objectively baseless, 3201 Realty primarily contends that they lacked standing when they made these challenges. For support, 3201 Realty points to the decisions of the New Jersey Superior Court and the New Jersey Department of Environmental Protection (“NJDEP”) respectively concluding that Village lacked standing in its prerogative writs action and flood hazard area (“FHA”) permit challenges. But as I already have noted, the ultimate failure of an underlying action does not establish its objective baselessness. See PRE, 508 U.S. at 60 n. 5, 113 S.Ct. at 1928 n. 5 (“[Wjhen the antitrust defendant has lost the underlying litigation, a court must ‘resist the understandable temptation to engage in post hoc reasoning by concluding’ that an ultimately unsuccessful ‘action must have been unreasonable or without foundation.’ ” (quoting Christiansburg, 434 U.S. at 421-22, 98 S.Ct. at 700)); Herr, 274 F.3d at 119 (rejecting plaintiffs claim of sham litigation where opinions in underlying actions demonstrated that courts analyzed relevant issues “with care and some detail” and did not consider them “frivolous”); Balt. Scrap Corp. v. David J. Joseph Co., 237 F.3d 394, 400 (4th Cir.2001) (rejecting antitrust plaintiff’s claim of sham litigation notwithstanding that state court had dismissed underlying suit for lack of standing).
3201 Realty has not shown that a reasonable litigant in Village’s position would have perceived that it did not have a realistic possibility of establishing standing in the relevant actions. To the contrary, the New Jersey Superior Court’s decision in the prerogative writs action demonstrates that a reasonable litigant could have perceived such a possibility in that case. In particular, Village cited several cases before that court in support of its claim that it had standing based on its status as a local taxpayer. For example, the court had stated in one of those cases that “[tjhere is some support for the proposition that any local taxpayer has standing to object to a variance application, although the question has not clearly been resolved.” Vill. Supermarket, Inc. v. Mayfair Supermarkets, Inc., 269 N.J.Super. 224, 634 A.2d 1381, 1385 (N.J.Super.Ct. Law Div.1993) (citing Booth v. Bd. of Adjustment of Rockaway Twp., 50 N.J. 302, 234 A.2d 681, 682 (1967)). The Superior Court ultimately decided this issue against Village, but “[ijn light of the unsettled condition of the law,” Village had a *203 reasonable basis for its position. PRE, 508 U.S. at 65, 113 S.Ct. at 1930.
Similarly, in the FHA permit challenge, Village argued that its expected loss of business as a direct competitor of the proposed supermarket qualified as a sufficiently particularized property interest to establish standing. But I need look no further than the discussion of antitrust standing in Judge Fuentes’s opinion to see that status as a direct competitor sometimes can demonstrate a unique property interest in filing a legal challenge. See, e.g., majority typescript at 26 (“Antitrust injury ordinarily is limited to consumers and competitors in the restrained market.”). Although the NJDEP ultimately decided to treat Village’s business interests as equivalent to other generalized interests that do not support standing, the cases on which it relied did not involve challenges brought by competitors and therefore did not foreclose Village’s argument. Village therefore had a reasonable basis for its position in this action as well. See id., 113 S.Ct. at 1931 (“Even in the absence of supporting authority, [the antitrust defendant] would have been entitled to press a novel ... claim as long as a similarly situated reasonable litigant could have perceived some likelihood of success.”).
Furthermore, 3201 Realty has not demonstrated that Village’s argument for standing in its wetlands permit challenge was any weaker than the foregoing arguments for standing. Finally, as to the major street intersection (“MSI”) permit challenge, the New Jersey Department of Transportation (“NJDOT”) affirmatively acknowledged Village’s standing to raise its objections, noting that the department was “required to consider any relevant data, analysis, and arguments submitted by third parties in reaching its decisions concerning the approval of access permits.” J.A. 165. I therefore reject 3201 Realty’s argument that defendants’ legal challenges should be regarded as objectively baseless because defendants lacked standing to make the challenges. See Balt. Scrap Corp., 237 F.3d at 400; Liberty Lake Invs., Inc. v. Magnuson, 12 F.3d 155, 157 (9th Cir.1993).
Nor has 3201 Realty demonstrated that defendants’ challenges were objectively baseless on their merits. Indeed, the relevant adjudicators upheld some of Village’s objections in two of these challenges. In the MSI permit challenge, the NJDOT agreed with Village that a prior development agreement required 3201 Realty either to construct certain highway improvements or negotiate a new agreement before it could proceed with its project. Likewise, in the wetlands permit challenge, the NJDEP first “required” 3201 Realty to re-notice its application due to a defect that Village identified in the original application. J.A. 169. Then, based on another objection raised by Village, the NJDEP required 3201 Realty to conduct a wildlife survey for the presence of an endangered species of bats before beginning work on the property. Although Village did not prevail in its other two challenges, the Superior Court’s and the NJDEP’s opinions in those proceedings each addressed Village’s contentions “with care and some detail” and without indicating that those reviewing bodies considered Village’s positions “frivolous.” See Herr, 274 F.3d at 119.
In these circumstances, 3201 Realty has not shown that defendants’ petitioning activity was objectively baseless. Defendants’ conduct therefore falls within the immunity afforded by the Noerr-Penning-ton doctrine, and 3201 Realty’s antitrust claims must fail. Therefore, we should affirm the District Court’s order dismissing the complaint. Inasmuch as I have *204 reached this conclusion, I do not address the other arguments that defendants raise in support of the. District Court’s order dismissing the complaint.[5]
II. JUDGE AMBRO’S AND MY AGREEMENT THAT THE DISTRICT COURT ENTERED THE CORRECT JUDGMENT MANDATES AN AFFIRMANCE.
As I stated at the outset of this opinion, Judge Ambro and I agree that the District Court correctly dismissed the complaint. Judge Ambro reaches this conclusion because he believes that 3201 Realty did not have the antitrust standing necessary to bring this action, and ,1 do so because I believe that defendants were immune under the Noerr-Pennington doctrine. A reasonable observer might think it is obvious that the inescapable consequence of this agreement is that we must affirm the District Court’s judgment dismissing the complaint. But Judge Ambro avoids this outcome by regarding himself as “bound by the majority’s [Judge Fuentes’s and Judge Greenberg’s] opinion on antitrust standing despite [his] disagreement with it,” Ambro typescript at 11, an application of the principle of stare decisis. He therefore effectively switches what should be his vote from an affirmance of the Court’s order to a reversal. As a result a majority of the panel consisting of Judge Fuentes and Judge Ambro announce the Court’s judgment based on the following shifting majorities as to individual issues: (1) Judge Fuentes’s and my view that 3201 Realty has antitrust standing and (2) Judge Fuentes’s and Judge Ambro’s view that 3201 Realty’s complaint overcomes a Noerr-Pennington defense. I regard it as ironical that even though I believe we should affirm the judgment of the District Court, my view on an issue on- which I would not decide the case is a factor leading to its reversal. Indeed, if I only stated my views on the Noerr-Pennington issue, then for certain we would be affirming because Judge Ambro surely would not have seen himself as bound by Judge Fuentes’s views if they stood alone. But I took a position on standing because courts usually if not always decide whether a plaintiff has standing before they consider the merits of a case.
Although it is not my place to tell Judge Ambro how and on what issues to vote, I write here to express my view that a mul-timember panel should reach the result that follows from the independent views of its members. Judge Ambro’s willingness to be bound by the Fuentes-Greenberg majority’s position on antitrust standing trumps his own conclusion on the standing issue and runs counter to the longstanding and widespread practice of the federal courts of appeals of counting judges’ views as to outcome and not as to individual issues. Although some scholars have criticized this prevailing practice, critics and proponents alike acknowledge its acceptance among the courts. See David S. Cohen, The Precedent-Based Voting Paradox, 90 B.U. L.Rev. 183, 222 (2010) (“[T]he [Supreme] Court currently uses outcome voting to reach a result, as it votes on the outcome and then the Justices write their opinions to support the outcome.”); Lewis A. Kornhauser & Lawrence G. Sager, The One and the Many: Adjudication in Col *205 legial Courts, 81 Cal. L.Rev. 1, 31 (1993) (“[T]he case-by-case protocol has been the encompassing norm of the Court throughout its existence.”); Jonathan Remy Nash, A Context-Sensitive Voting Protocol Paradigm for Multimember Courts, 56 Stan. L.Rev. 75, 86 (2003) (“[T]he standard voting protocol is generally to determine the ultimate outcome in a case ... based upon each judge’s views as to the outcome in the case.”); David Post & Steven C. Salop, Rowing Against the Tidewater: A Theory of Voting by Multijudge Panels, 80 Geo. L.J. 743, 750 (1992) (“It is clear that courts most frequently utilize outcome-voting.”); John M. Rogers, “Issue Voting” by Multi-member Appellate Courts: A Response to Some Radical Proposals, 49 Vand. L.Rev. 997, 998 (1996) (“[T]he overwhelming practice of the justices on the Court has been to vote for the consequence of the individual justice’s own reasoning.”); Maxwell L. Stearns, Standing and Social Choice: Historical Evidence, 144 U. Pa. L.Rev. 309, 313-14 (1995) (“Within particular cases, the Court — along with virtually all appellate courts — employs case-by-case, rather than issue-by-issue, decisionmaking.”).
This practice of outcome voting comports with the general primacy that our law affords to judgments over opinions. See Jennings v. Stephens, — U.S.-, 135 S.Ct. 793, 799, 190 L.Ed.2d 662 (2015); Edward A. Hartnett, A Matter of Judgment, Not a Matter of Opinion, 74 N.Y.U. L.Rev. 123, 127-34 (1999). It is well established that we review a district court’s judgment, not its opinion. See Jennings, 135 S.Ct. at 799; Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 303 n. 73 (3d Cir.2014), cert. denied, — U.S.-, 135 S.Ct. 1738, 191 L.Ed.2d 702 (2015). Just as this principle requires us to affirm a district court’s judgment even if that court’s reasoning differs from our own, it also should lead us to affirm even if our respective grounds for doing so diverge. See Blunt, 767 F.3d at 303 n. 73 (affirming district court’s order even though only Judge Greenberg agreed with that court’s rationale because Judge Ambro reached same disposition on other grounds).
In view of the primacy of judgments over opinions, we may enter judgments without even issuing opinions. See, e.g., Quaciari v. Allstate Ins. Co., 172 F.3d 860 (3d Cir.1998); Hoover v. Watson, 74 F.3d 1226 (3d Cir.1995); see also Fed.R.App. P. 36. In fact, until some years ago this Court regularly disposed of appeals by issuing judgment orders without accompanying opinions, sometimes even in complex cases. Indeed, our internal operating procedures still authorize the use of judgment orders to announce the outcome of a case though the practice of using judgment orders has fallen - into disuse.3d Cir. I.O.P. 6.1. And in cases that do result in the issuance of opinions, both the Supreme Court and this Court issue the judgment supported by the independent views of a majority of the judges even if a majority does not coalesce around a single rationale. See, e.g., Kerry v. Din, — U.S.-, 135 S.Ct. 2128, 2131, 192 L.Ed.2d 183 (2015) (plurality opinion); United States v. Dupree, 617 F.3d 724, 726 (3d Cir.2010); Cruz v. Chesapeake Shipping, Inc., 932 F.2d 218, 220 (3d Cir.1991) (Rosenn, J., announcing the judgment of the court); cf. Michael v. Horn, 459 F.3d 411, 429 n. 18 (3d Cir.2006) (Greenberg, J., concurring) (“[I]t is always true that even though judges agree on the appropriate outcome of a case, they would not write identical opinions.”). “That the court is able to issue any judgment at all in such cases clearly demonstrates that outcome-voting has been utilized.” Post & Salop, Rowing Against the Tidewater, supra, at 750. Accordingly, “the outcome of a case in a multimember court depends on the tally of votes concerning the judgment even if the *206 tally of votes concerning each issue resolved by opinion would logically produce a different conclusion.” Hartnett, supra, at 134.
Judge Ambro declines to follow this accepted practice of independent outcome voting because of the “voting paradox” that arises if issue-by-issue resolution of a case would lead to a conclusion that is opposite to that reached based on outcome voting. But in the absence of the voting paradox it would not matter if a court decided a case on an issue-by-issue or outcome basis. Moreover, the Supreme Court repeatedly and consistently has utilized outcome voting even in cases implicating the voting paradox. See, e.g., Miller v. Albright, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998); Am. Trucking Ass’ns, Inc. v. Smith, 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990); Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949); see also Cohen, supra, at 183-84 (noting existence of more than 30 such cases in Supreme Court history). Moreover, as Judge (then Professor) Rogers has pointed out “[OJver 150 Supreme Court cases involving plurality majority opinions indicate that a justice should not [aggregate votes by issue and therefore] defer to a majority that disagrees on a dispositive issue.” John M. Rogers, “I Vote This Way Because I’m Wrong”: The Supreme Court Justice as Epimenides, 79 Ky. L.J. 439, 459 (1990-91).
So far as I can ascertain the only support in Supreme Court cases for Judge Ambro’s vote which leads to a result on a controlling issue in the case different from that which should follow from his view of the case comes from three cases in which justices deferred to a majority on an issue that they would have resolved differently and therefore provided the decisive vote or votes in favor of a judgment that contradicted their own reasoning. See Arizona v. Fulminante, 499 U.S. 279, 313-14, 111 S.Ct. 1246, 1267, 113 L.Ed.2d 302 (1991) (Kennedy, J., concurring in the judgment); Pennsylvania v. Union Gas Co., 491 U.S. 1, 56-57, 109 S.Ct. 2273, 2295-96, 105 L.Ed.2d 1 (1989) (White, J., concurring in the judgment in part and dissenting in part); United States v. Vuitch, 402 U.S. 62, 96, 91 S.Ct. 1294, 1311, 28 L.Ed.2d 601 (1971) (Harlan, J., dissenting); id. at 97-98, 91 S.Ct. at 1312 (separate opinion of Blackmun, J.). Significantly, each of the other justices in these cases maintained the normal practice of voting for the judgment supported by the justice’s' own reasoning. See Hartnett, supra, at 137; Kornhauser & Sager, supra, at 18-19, 24. Moreover, the justices who gave the “structurally aberrant” votes did not offer any explanation for their divergence from accepted practice. Kornhauser & Sager, supra, at 2; see Nash, supra, at 84 (noting that judges who have employed issue-based voting have “simply do[ne] so by fiat”); Rogers, “Issue Voting”, supra, at 998 (“There was no tenable justification given for the anomalous votes in each ease.... ”). These few deviations, “supported by simple ipse dixit, are pretty meager authority compared to the overwhelming precedent against” the majority’s approach. Rogers, “I Vote This Way Because I’m Wrong”, supra, at 463.
Judge Ambro explains his use of issue voting and his consequent vote that results in an outcome that as an individual judge he rejects as a consequence of Judge Fuentes’s and my view on “the scope of the law of antitrust standing [which is] now the law of this Circuit ... I am obliged to consider the merits of [3201 Realty’s] suit.” Id. at 1. Thus, to Judge Ambro the principal of stare decisis applied on an internal basis within a case controls the outcome of this appeal even though he does not use the term stare *207 decisis in explaining his view of how to decide the case. I believe, however, that this reasoning is incorrect. To start, at the time that Judge Ambro wrote these words, and even now, the panel had not yet filed an opinion in this case, so Judge Fuentes’s opinion cannot be the law of this Circuit. This point cannot be dismissed as a mere timing technicality because the draft opinion must be circulated to all the active judges of the Court who then have an opportunity to vote for initial en banc consideration of the case before the opinion is fíled.3d Cir. I.O.P. 5.5.
Nor does Judge Ambro’s decision to defer in this case to a majority’s view on the standing issue present an apt analogy to the application of the principle of stare decisis. Deferring to a majority resolution of an issue within the same case does not serve the policies underlying stare decisis, including the protection of individuals’ reliance on earlier cases, the need to maintain consistency with earlier cases, the judicial efficiency of not revisiting issues that already have been decided, and the idea that the collective wisdom of courts over the years should supersede the limited insights of a court hearing a single case. See Rogers, “I Vote This Way Because I’m Wrong”, supra, at 463-65. Furthermore, if a judge had an obligation to follow a panel majority’s conclusion there never should be a dissent.
Yet as discussed, rather than following a rule of deference to a majority within the same case, judges nearly invariably vote for the result supported by their individual reasoning, whether the case involves a voting paradox or not. It is obvious that each instance in which a judge dissents reflects an example of a judge declining to defer to a majority view. Accordingly, Judge Am-bro’s use of the principle of stare decisis to support his vote runs “contrary to the overwhelming weight of precedent.” Rogers, “I Vote This Way Because I’m Wrong”, supra, at 440. Such rare and selective deference constitutes little deference at all, let alone a proper analogue to the rule of stare decisis, which serves very different purposes.
I recognize that in voting-paradox cases, outcome voting does produce an apparently odd result when compared with the outcome that results when a case is decided on the basis of the judges’ individual reasoning regarding each underlying issue. But, contrary to Judge Ambro’s suggestion, outcome voting does not render the precedential value of such cases “unclear.” Ambro typescript at 22.
Outcoming voting in this case would yield the following straightforward body of law for district courts in this Circuit to apply: (1) if a case arises that only implicates the standing issue, then, if the facts of that case cannot be distinguished from those here, the court should hold that the plaintiff has antitrust standing based on Judge Fuentes’s and my resolution of that issue; (2) if a case arises that implicates the Noerr-Pennington issue in a situation that factually cannot be distinguished from that in this case, the court should hold that the defendant lacks such immunity based on Judge Fuentes’s and Judge Ambro’s resolution of that issue; but (3) if a case arises presenting both issues, then, again, if the facts of that case cannot be distinguished frpm the facts here, the court should dismiss the case. See, e.g., Greene v. Teffeteller, 90 F.Supp. 387, 388 (E.D.Tenn.1950) (applying Supreme Court case that involved voting paradox and emphasizing that “precedent is established by the votes of the justices, not by the reasons given for their votes.”). Although no judge would reach all of these three conclusions if acting alone, district courts could apply this tripartite rule both “easily” and “consistently.” Rogers, “Issue *208 Voting”, supra, at 1013. Hence, outcome voting would produce “clear” guidance to district courts. Id. at 1009.
Moreover, issue voting does not offer a panacea to the problem of voting paradoxes. Rather,' issue voting raises its own set of potential difficulties, including indeterminacy in how to identify the relevant issues, the prospect of a judge strategically flipping the judgment by dividing an issue into deeper sub-issues where a majority of the judges agree as to the' meta-issue but not as to the sub-issues, the possible inability of the court to issue a judgment due to cycling in how a majority would prefer to resolve the relevant issues, and the thwarting of a majority’s view as to the correct judgment. See Cohen, supra, at 223-24; Michael I. Meyerson, The Irrational Supreme Court, 84 Neb. L.Rev. 895, 947-49 (2006); Rogers, “Issue Voting”, supra, at 1002-06; Maxwell L. Stearns, How Outcome Voting Promotes Principled Issue Identification: A Reply to Professor John Rogers and Others, 49 Vand. L.Rev. 1045, 1063-65 (1996); Maxwell L. Stearns, The Misguided Renaissance of Social Choice, 103 Yale L.J. 1219, 1267 n.177 (1994). Thus, even proponents of issue voting concede that “there is potential incoherence in an issue voting system” as well. David G. Post & Steven C. Salop, Issues and Outcomes, Guidance, and Indeterminacy: A Reply to Professor John Rogers and Others, 49 Vand. L.Rev. 1069, 1083 (1996).
The difficulties introduced by issue voting even may undermine the clarity and usability of precedents, the very problem that Judge Ambro identifies as a consequence of outcome voting. See Rogers, “Issue Voting”, supra, at 1009-11. After all, just seven years after Justice White employed issue voting to change the outcome in Union Gas, the Supreme Court overruled that case partly because of the “confusion” it had created “among the lower courts that ha[d] sought to understand and apply the deeply fractured decision.” Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 64, 116 S.Ct. 1114, 1127, 134 L.Ed.2d 252 (1996). The Court’s about-face can be viewed as “a criticism of the practice of vote switching” and may “stand[ ] for the proposition that holdings produced as a result of a vote switch will have only limited stare decisis value.” Maxwell L. Stearns, Should Justices Ever Switch Votes?: Miller v. Albright in Social Choice Perspective, 7 Sup.Ct. Econ. Rev. 87, 155 (1999). Problems therefore attend to either voting protocol. “Rather than rail at the dilemma wrought by the imperfections of our system [of outcome voting], ... we should recognize that these imperfections are simply part of the inherent limitations of humanity.” Meyerson, supra, at 952.
To the extent that judges find the voting paradox dissatisfying, instead of abandoning the longstanding and widespread practice of independent outcome voting, they can avoid the paradox by not considering issues after addressing an issue that would for them resolve the case. See id. at 951; Post & Salop, Issues and Outcomes, supra, at 1072 (noting that the paradox can only occur if “the judges reveal their views on each of the underlying issues presented by the case”). Unlike issue voting, the decision not to reach unnecessary questions, even when that decision involves not deferring to a majority on an issue and results in a judgment not supported by a single majority rationale,' has firm roots within our appellate court practice. See, e.g., Cruz, 932 F.2d at 233 (Cowen, J., concurring in the judgment only); Lowry v. Balt. & Ohio R.R. Co., 707 F.2d 721, 723 (3d Cir.1983) (en banc) (per curiam); see also Rogers, “I Vote This Way Because I’m Wrong” supra, at 449 n. 27 (collecting more than two dozen such Supreme Court *209 cases). Indeed, the voting paradox may so seldom appear in appellate court opinions because the judges in the majority as to outcome “typically do not reveal their views on issues that they ‘do not need to reach’ in order to vote for” that outcome. Post & Salop, Rowing Against the Tidewater, supra, at 748.
Again, it surely is not for me to tell another judge how to vote. Yet I cannot help being aware that there would not be a voting paradox here if Judge Ambro had gone no further after concluding that the District Court’s dismissal of the complaint should be affirmed on the ground that 3201 Realty lacks antitrust standing. There is no doubt that if Judge Ambro had followed this approach, we would affirm based on his and my independent reasoning. See Hartnett, supra, at 142-43 (“In [Union Gas and Fulminante], not only did the judgment ultimately entered fail to reflect how a majority of Justices believed the case should have been decided, but worse, unnecessary statements in opinions altered the judgment in the case.... That is not a result we should welcome.... ”).
In fact, if Judge Ambro had gone no further after concluding that the District Court’s judgment should be affirmed because 3201 Realty lacks antitrust standing, we inescapably would affirm regardless of whether we used outcome or issue voting. If we used outcome voting, then two judges, Judge Ambro and I, would be voting to affirm. If we used issue voting, then the vote on the Noerr-Pennington issue would have been equally divided, with Judge Fuentes rejecting the defense of immunity and with me accepting it. The consequence of that even split is that the District Court’s order of dismissal would have been affirmed by an equally divided vote. See Exxon Shipping Co. v. Baker, 554 U.S. 471, 484, 128 S.Ct. 2605, 2616, 171 L.Ed.2d 570 (2008); In re Mkt. Square Inn, Inc., 978 F.2d 116, 121 (3d Cir.1992). Though the District Court did not address the Noerr-Pennington issue as it had no need to do so because 3201 Realty did not convince the Court that it had antitrust standing, still defendants advanced the defense in that Court so that the claim of Noerr-Pennington immunity was preserved and thus defendants properly could raise it on this appeal. Accordingly, the usual rule that an equally divided appellate court leads to an affirmance of the trial court’s judgment would apply.
Judge Ambro contends that if 3201 Realty had prevailed on the standing issue in the District Court and if the defendants were not barred from appealing by the final judgment rule and had appealed, we would have affirmed on the standing appeal. Then if défendants prevailed on the Noerr-Pennington issue in the District Court and 3201 Realty appealed we would have reversed. Thus, 3201 Realty would win the case even though a majority of the panel thought it should lose. While Judge Ambro may be correct on this point this hypothetical set of facts did not happen.
Furthermore, a different hypothetical supports the use of outcome voting. Suppose this appeal had been decided by a single judge. If I had been that judge, then the District Court’s order would be affirmed. If Judge Ambro had been that judge, once again the District Court’s order would be affirmed. Only if Judge Fuentes had been that judge, would the District Court’s order have been reversed. I cannot understand why the circumstance that we are all on the panel should lead to a different result than that which would have been reached individually by a majority of the panel.
Issue voting “is in considerable tension with the traditional emphasis, rooted in Article III, on courts as case deciders.” Hartnett, supra, at 134 n. 58. As has long *210 been true, “[t]he question before [us as] an appellate Court is, was the judgment correct, not the ground on which the judgment professes to proceed.” McClung v. Silliman, 19 U.S. (6 Wheat.) 598, 603, 5 L.Ed. 340 (1821). Although almost two centuries have passed since the Supreme Court decided McClung, the law that the Court stated there remains good law and no court has better expressed the principle that it recognized. Inasmuch as two of the three members of the panel agree that the judgment was correct, though for different reasons, surely we are constrained to affirm.[6] Because the Court does not reach this result and because I believe that defendants have a Noerr-Pennington defense, I respectfully dissent from the outcome the Court reaches ' even though I agree with Judge Fuentes on his resolution of the standing issue.

. I refer to Village and Hanover and Horsehill Development LLC together as defendants.

. Defendants raised this argument both in the District Court and in their answering brief on appeal. 3201 Realty failed to address the merits of the argument in its reply brief, but we afforded it an opportunity to do so in a supplemental reply brief and it did so.

. As I explain below there now is an additional case that Village has initiated to consider. See infra note 5. But the addition of this case does not change my conclusion.

. I agree with Judge Ambro and Judge Fuentes that the circumstance that some of defendants’ legal actions are ongoing does not preclude application of the sham exception, although I do so based on Supreme Court precedent and not based on the "prospective” character of the alternative test. Majority typescript at 37 n. 14. In Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977), the Court faced the question of whether a district court could enjoin an ongoing state court proceeding that allegedly violated federal antitrust law. The Court fractured into three opinions, none of which obtained a majority. See id. at 626, 97 S.Ct. at 2885 (plurality opinion of Rehnquist, J.); id. at 643, 97 S.Ct. at 2893 (Blackmun, J., concurring in result); id. at 645, 97 S.Ct. at 2894 (Stevens, J., dissenting). Nevertheless, although a majority of the Court concluded that the Anti-Injunction Act barred the district court from enjoining the state court proceeding at issue, all nine justices either explicitly or implicitly acknowledged that plaintiffs can seek some form of relief, such as damages or injunctions against future legal actions, based on ongoing sham proceedings brought in violation of the antitrust laws. See id. at 635 n. 6, 637 n. 8, 97 S.Ct. at 2889 n. 6, 2890 n. 8 (plurality opinion of Rehnquist, J.); id. at 644, 97 S.Ct. at 2894 (Blackmun, J., concurring in result); id. at 653-54, 97 S.Ct. at 2899 (Stevens, J., dissenting). Indeed, six of the justices declared that, in appropriate circumstances, such antitrust relief could include an injunction against the ongoing sham proceedings themselves. See id. at 644, 97 S.Ct. at 2894 (Blackmun, J., concurring in result); id. at 654, 660, 97 S.Ct. at 2899, 2902 (Stevens, J., dissenting). Subsequently, in a case arising under federal labor law, the Court drew on the sham exception to Noerr-Pennington to hold that an ongoing baseless lawsuit may be enjoined if it was brought for an improper purpose. See Bill Johnson’s Rests., Inc. v. NLRB, 461 U.S. 731, 744, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1983).
These Supreme Court cases illustrate that a plaintiff can bring an antitrust claim circumventing Noerr-Pennington immunity by relying on the sham exception even if the allegedly sham legal actions remain pending. This conclusion is logical given that a determination of whether anticompetitive legal actions fall within the sham exception turns not on their ultimate outcomes but on the existence of a reasonable basis (or a proper motive) for instituting and pursuing them in the first place. See PRE, 508 U.S. at 60 n. 5, 113 S.Ct. at 1928 n. 5.

. On September 10, 2015, 3201 Realty’s attorneys filed a letter with attachments pursuant to Fed. R.App. P. 28® indicating that Village's chief operating officer on August 12, 2015, filed a complaint in the Superior Court of New Jersey seeking an injunction stopping ons clearing work on 3201 Realty's property on the ground that 3201 Realty obtained its wetland permit by fraud. To the best of my knowledge this case has not been resolved so I do not take it into account as I do not know if the suit is objectively baseless.

. In my view, this case can be resolved by making simple mathematical calculations that do not require that we use a super computer: (1) one and one make two, and (2) two out of three is a majority.